UNITED STATES of America
v.
Victor CALAMARO, Appellant.
No. 11846.

United States Court of Appeals Third Circuit.

Argued May 24, 1956.

Decided July 11, 1956.

Certiorari Granted Oct. 15, 1956.

See 77 S.Ct. 97.

Raymond J. Bradley, Philadelphia, Pa., (Thomas D. McBride, McBride, von Moschzisker & Bradley, Philadelphia, Pa., on the brief), for appellant.

Norman C. Henss, Asst. U. S. Atty., Philadelphia, Pa. (W. Wilson White, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The special occupational tax, recently imposed on gamblers by Section 471(a) of the Revenue Act of 1951, 65 Stat. 531, 26 U.S.C. § 3285 et seq., and the attendant criminal sanctions are bringing bizarre problems to the national courts. Witness the present appeal, which turns on a question of job classification in the so-called numbers racket.

The legislative scheme makes a person, who engages in a type of gambling activity which is taxable under Section 3290 of Title 26 of the United States Code without having paid the tax, guilty of a crime under Section 3294(a) of that Title. Such a conviction has led to this appeal.

The first question presented is whether the district court erred in not directing an acquittal on the ground that the proved conduct of the accused did not make him liable to the gambler's tax. In terms, Section 3290 imposes a special occupational tax not only on the entrepreneur "who is engaged in the business of accepting wagers" but also on one "who is engaged in receiving wagers for" such an entrepreneur.

The evidence revealed appellant Calamaro as a very minor functionary in the conduct of that illegal type of lottery called the numbers game. It is conceded that he is not "engaged in the business of accepting wagers" within the meaning of

the statute.[1] But the court below thought Calamaro's activity, as proved, amounted to "receiving wagers" within the meaning of Section 3290. Whether that conclusion is correct must be decided in the light of what the record shows about the organization of this illegal business and the specific role played by appellant.

From the evidence we learn that an operating center for numbers play is called a "bank". Each day the written notations of the many "plays", showing how much each bettor has wagered and upon what number or numbers, are channeled into the bank for recordation and appropriate action. In due season the bank also disburses sums won by the relatively few bettors upon whose illegal chance-taking fortune has smiled. But neither in placing his wager nor in collecting, if he wins, does the bettor visit the bank or establish direct contact with the headquarters operation. Rather, he places his wager with one of many scattered field operatives called "writers". We are told that the "writing" procedure is standardized in that the "writer" records each wager in triplicate on standard slips; one for the bettor, a duplicate to be retained by the writer, and a third or action copy, identified by its yellow color, for the bank.

But the writer does not come into personal contact with the bank any more than does the bettor. The "numbers banker", even as bankers and brokers in reputable commerce, employs salaried runners and messengers. These couriers are called "pick-up men." It is the duty of a pick-up man to make a daily round of writers, collect yellow slips from them and carry these items to the bank.

Calamaro was a salaried pick-up man. He was intercepted, apparently inbound on his appointed round, by an alert police officer and found to have on his person telltale numbers paraphernalia; to wit, notations of bets recorded on yellow slips, such as already have been described. His conduct became a matter of concern to the federal authorities upon discovery that he was going about his illegal work without having rendered unto Caesar any Section 3290 tribute. Whether that section applied to him as a pick-up man, is the present issue.

In normal usage of familiar language, "receiving wagers" is what someone on the "banking" side of gambling does in dealing with a bettor. Placing and receiving a wager are opposite sides of a single coin. You can't have one without the other.[2] Before the pick-up man enters the picture, in such a case as we have here, the wager has been received physically by the writer and, in legal contemplation, by the writer's principal as well. The government recognizes —and in an appropriate case no doubt would insist—that what the writer does in relation to the bettor amounts to "receiving a wager." Thus, the government has to argue that the wager is received a second time when the writer hands the yellow slip to the pick-up man. But we

---

1. The correctness of this concession is indicated by the legislative history of the statute. Both Senate and House Reports on the bill state such a limitation on the concept of engaging in the business of accepting wagers.

"A person is considered to be in the business of accepting wagers if he is engaged as a principal who, in accepting wagers, does so on his own account. The 'principals' in such transactions are commonly referred to as 'bookmakers', * * *." H.R.Rep. No. 586, 1951, 82d Cong., 1st Sess. 1783, 1839; S.Rep. No. 781, Id. 1969, 2091.

This restrictive concept has been recognized and applied by the Court of Appeals for the Fifth Circuit in Sagonias v. United States, 5 Cir., 1955, 223 F.2d 146. On the other hand a general instruction, part of which seems to disregard this concept, was approved by the Court of Appeals for the First Circuit in Daley v. United States, 1956, 231 F.2d 123. However, that case did not involve pick-up men or operatives in any analogous situation, and it does not appear that the legislative history was brought to the court's attention.

2. Among the definitions in the statute, one which is significant here defines "wager" as "any wager placed in a lottery conducted for profit." 26 U.S.C., 1952, § 3285(b) (1) (C).

think this ignores the very real difference between a wager and a record of a wagering transaction. It is the banking record and not the wager which the pick-up man receives from the writer and transmits to the bank. The pick-up man no more receives wagers than a messenger, who carries records of customer transactions from a branch bank to a central office, receives deposits.

Recognizing this analytical difficulty, the government argues in generality that all who participate on the banking side of the numbers game may be viewed as receiving wagers. But this is an enlargement of the meaning of ordinary language used by Congress beyond ordinary usage and understanding. Certainly, such enlargement is not justified when the matter in issue is the scope of a statutory duty, compliance with which is enforced by a criminal sanction.

In reaching this conclusion we are aware that we are disagreeing with the United States Court of Appeals for the Fifth Circuit which, in Sagonias v. United States, 1955, 223 F.2d 146, upheld the conviction of a pick-up man in a case indistinguishable from this one. Three sentences in the Sagonias opinion state its rationale:

"* * * [T]he primary purpose of the statute as a whole was to produce revenue by subjecting commercialized gambling to taxation. Its provisions clearly indicate that the special tax applies to the principal or proprietor and all persons who were knowingly engaged or used by him to receive wagers. While the express wording of Section 3290 does not include other employees directly involved in the operation, we think it would be inconsistent with the purpose of the statute to tax those who physically receive the wagers and exempt those whose duties were as important and as much a necessary part of the gambling operation." 223 F.2d at pages 147–148. If we assume that this judicial view of general statutory purpose is correct, to us it still does not seem to follow that

language which on its face merely imposes a tax on two categories of gambling personnel can properly be read as implying that all other categories of gambling personnel are also taxable. *Ejusdem generis* may be appropriate enough as a rule of limitation in construing a conjunctive coupling of specifics with a generality. But we can see no warrant for an enlargement of meaning *ejusdem generis* in a case like this where the legislature has used no general language to suggest that it was attempting to extend the tax beyond the enumerated categories of acceptors and receivers.

Finally, the Sagonias opinion also cites, as a makeweight, a statement in Section 325.41 of Regulation 132 promulgated November 3, 1951, by the Treasury Department. There the Department lists some examples of types of employment which in its view obligate the worker to pay this tax. One example is employment by an operator of a numbers game "to collect from his agents the wagers received on his behalf." But we think the statutory statement of taxable categories is not ambiguous and not comprehensive enough on its face to make the situation of a pick-up man an apt example of its coverage. To accept the Treasury view would be to add to the statute something which simply is not there.

We conclude that the district court should have granted appellant's motion for acquittal. We have not considered any of appellant's objections to other rulings of the trial court.

The judgment will be reversed.

McLAUGHLIN, Circuit Judge (dissenting).

In its attempted delicate distinction which carefully removes appellant from the reach of the tax and, in effect, emasculates the statute, the majority ignores the realities of the case.

Admittedly appellant receives the ticket identifying the particular wager from which, according to the testimony, after the winning number has "come out" the bank determines whether it is obligated

**186**

to pay that particular ticket. What more is needed to "receive a wager" does not appear from the court's decision. Further, instead of appellant being an inconsequential messenger, he is a direct representative of the "banker", a man from headquarters. Appellant stems directly from the "banker" to the "writers", an indispensable link in the day to day functioning of this vicious operation. With his class now exonerated everyone connected with "numbers" anywhere, if put to it, should have little difficulty avoiding the impact of Section 3290 by simply asserting that he is merely a "pick-up" man.

From the facts, appellant is a necessary and important participant in the ugly corroding racket involved. Not only is he subject to that part of the law imposing liability on those persons " 'engaged in receiving wagers' ", Sagonias v. United States, 5 Cir., 1955, 223 F.2d 146, but he also comes directly under it as one "engaged in the business of accepting wagers". That is the clear holding of Daley v. United States, 1 Cir., 1956, 231 F.2d 123, 128. There, the court specifically affirmed that portion of the trial judge's charge which stated that,

"* * * to be 'engaged in the business of conducting a wagering pool or a lottery, a person does not have to personally receive money or a number pool or lottery bet from a bettor; if he is an active participant knowingly in an essential part of the management structure in the processing of such wagering pool or lottery bets in an existing wagering or lottery business, whether top manager, agent solicitor on the street, or an employee or associate of a communications center or central bookkeeping agency of an organization which was engaged in accepting wagers, or conducting a wagering pool or a lottery, he is engaged in such business.' "

There are no reported decisions in accord with the majority view. I would affirm the judgment of the district court.