## UNITED STATES v. CALAMARO.

No. 304.   Argued March 4, 1957.—
Decided June 17, 1957.

*Leonard B. Sand* argued the cause for the United States. On the brief were *Solicitor General Rankin, Assistant Attorney General Olney, Beatrice Rosenberg* and *Julia P. Cooper.*

*Raymond J. Bradley* argued the cause for respondent. With him on the brief was *Edwin P. Rome.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question before us is whether the respondent, a so-called "pick-up man" in a type of lottery called the "numbers game," is subject to the annual $50 special occupational tax enacted by Subchapter B of Chapter 27A (Wagering Taxes) of the Internal Revenue Code of 1939, 65 Stat. 530, 26 U. S. C. § 3285 *et seq.*

As will be seen from the statute, whose material parts are printed in the margin,[1] this Chapter of the 1939 Code enacts two kinds of wagering taxes: (1) An excise tax, imposed by § 3285 (d) on persons "engaged in the business of accepting wagers," and (2) a special occupational tax, imposed by § 3290 not only on persons who are sub-

---

[1] "SUBCHAPTER A—TAX ON WAGERS

"SEC. 3285.   TAX.

"(a) WAGERS.—There shall be imposed on wagers, as defined in subsection (b), an excise tax equal to 10 per centum of the amount thereof.

"(b) DEFINITIONS.—For the purposes of this chapter—

"(1) The term 'wager' means (A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers, (B) any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit, and (C) any wager placed in a lottery conducted for profit.

"(2) The term 'lottery' includes the numbers game . . . .

.          .          .          .          .

"(d) PERSONS LIABLE FOR TAX.—Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.

.          .          .          .          .

"SUBCHAPTER B—OCCUPATIONAL TAX

"SEC. 3290.   TAX.

"A special tax of $50 per year shall be paid by each person who is liable for tax under subchapter A or who is engaged in receiving wagers for or on behalf of any person so liable.

"SEC. 3291.   REGISTRATION.

"(a) Each person required to pay a special tax under this subchapter shall register with the collector of the district—

"(1) his name and place of residence;

"(2) if he is liable for tax under subchapter A, each place of business where the activity which makes him so liable is carried on,

ject to the excise tax, being "engaged in the business," but also on those who are "engaged in receiving wagers" on behalf of one subject to the excise tax. By definition the "numbers game" is among the wagering transactions included in the statute.

At the outset we must understand some professional gambling terminology which has been given us by the parties. A numbers game involves three principal functional types of individuals: (1) the "banker," who deals in the numbers and against whom the player bets; (2) the "writer," who, for the banker, does the actual selling of the numbers to the public, and who records on triplicate slips the numbers sold to each player and the amount of his wager; and (3) the "pick-up man," who collects wagering slips [2] from the writer and delivers them to the banker. If there are winnings to be distributed, the banker delivers the required amount to the writer, who in turn pays off the successful players.

The respondent here was a pick-up man for a Philadelphia banker, receiving for his services a salary of $40 a week, but having no proprietary interest in this num-

---

and the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf; and

"(3) if he is engaged in receiving wagers for or on behalf of any person liable for tax under subchapter A, the name and place of residence of each such person.

.  .  .  .  .

"SEC. 3294. PENALTIES.

"(a) FAILURE TO PAY TAX.—Any person who does any act which makes him liable for special tax under this subchapter, without having paid such tax, shall, besides being liable to the payment of the tax, be fined not less than $1,000 and not more than $5,000." 65 Stat. 530, 26 U. S. C. §§ 3285–3294.

[2] The pick-up man collects the "yellow" copy. The "tissue" copy is given to the player when he places his bet, and the "white" copy is retained by the writer.

bers enterprise. He was convicted, after a jury trial in the United States District Court for the Eastern District of Pennsylvania, of failing to pay the § 3290 occupational tax, and was fined $1,000.[3] The Court of Appeals reversed by a divided court, 236 F. 2d 182, and upon the Government's petition we granted certiorari, 352 U. S. 864, to resolve the conflict between the decision below and that of the Court of Appeals for the Fifth Circuit in *Sagonias* v. *United States,* 223 F. 2d 146, as to the scope of § 3290. For reasons given hereafter we consider that the Court of Appeals in this case took the correct view of this statute.

The nub of the Court of Appeals' holding was put in the following language, with which we agree:

"In normal usage of familiar language, 'receiving wagers' is what someone on the 'banking' side of gambling does in dealing with a bettor. Placing and receiving a wager are opposite sides of a single coin. You can't have one without the other. [The court here referred to the definition of "wager" contained in § 3285 (b)(1)(C); note 1, *supra.*] Before the pick-up man enters the picture, in such a case as we have here, the wager has been received physically by the writer and, in legal contemplation, by the writer's principal as well. The government recognizes—and in an appropriate case no doubt would insist—that what the writer does in relation to the bettor amounts to 'receiving a wager.' Thus, the government has to argue that the wager is received a second time when the writer hands the yellow slip to the pick-up man. But we think this ignores the very real difference between a wager and a record of a wagering transaction. It is the banking record and

---

[3] 137 F. Supp. 816.

not the wager which the pick-up man receives from the writer and transmits to the bank. The pick-up man no more receives wagers than a messenger, who carries records of customer transactions from a branch bank to a central office, receives deposits." 236 F. 2d, at 184–185.

We do not think that either the language or purpose of this statute, as revealed by its legislative history, supports the position of the Government. When the phrase "receiving wagers" is read in conjunction with § 3285 (b)(1), which defines "wager" in terms of the "placing" of a bet in connection with any of the kinds of wagering transactions embraced in the statute,[4] it seems evident that the Court of Appeals was quite correct in regarding the "placing" and "receiving" of a wager as being "opposite sides of a single coin." [5] In other words, we think that as used in § 3290 the term "receiving" a wager is synonymous with "accepting" a wager; [6] that it is the making of a gambling contract, not the transportation of a piece of paper, to which the statute refers; and hence that, in such a case as this, it is the writer and not the pick-up man who is "engaged in receiving wagers" within the meaning of § 3290.

---

[4] See note 1, *supra*.

[5] That the "placing" and "receiving" of a wager should be regarded as simply complementing one another is recognized by Treasury Regulations 132, § 325.24 (a) of which states:

". . . Any wager or contribution received by an agent or employee on behalf of such person [one in the business of accepting wagers or operating a wagering pool or lottery] shall be considered to have been accepted by and placed with such person." 26 CFR, 1957 Cum. Pocket Supp., § 325.24 (a).

[6] Indeed, the information filed against the respondent, which charged him with failing to pay the § 3290 occupational tax, alleged that he "did accept," not that he "did receive," wagers. 137 F. Supp., at 817, n. 1.

We consider the legislative history of the statute, such as it is, to be fully consistent with this interpretation of § 3290. In the Senate and House Reports on the bill, it is stated:

". . . A person is considered to be in the business of accepting wagers if he is engaged as a principal who, in accepting wagers, does so on his own account. The principals in such transactions are commonly referred to as 'bookmakers,' although it is not intended that any technical definition of 'bookmaker,' such as the maintenance of a handbook or other device for the recording of wagers, be required. *It is intended that a wager be considered as 'placed' with a principal when it has been placed with another person acting for him. Persons who receive bets for principals are sometimes known as 'bookmakers' agents' or as 'runners.'* . . .

"As in the case of bookmaking transactions, *a wager will be considered as 'placed' in a pool or in a lottery whether placed directly with the person who conducts the pool or lottery or with another person acting for such a person.*" H. R. Rep. No. 586, 82d Cong., 1st Sess. 56; S. Rep. No. 781, 82d Cong., 1st Sess. 114 (emphasis added).

Again, in the case of a numbers game, this indicates that Congress regarded the "placing" of a wager as being complemented by its "receipt" by the banker or by one acting for him in that transaction, that is, the writer and not the pick-up man.

Nor, contrary to what the Government contends, can we see anything in the registration provisions of § 3291 which points to the pick-up man as being considered a "receiver" of wagers. Those provisions simply provide that one liable for any tax imposed by the statute must

register his name and address with the collector of the district, and require in addition, (a) as to those subject to the § 3285 excise tax, the registration of the name and address "of each person who is engaged in receiving wagers for him or on his behalf," and (b) as to those subject to the § 3290 occupational tax, the registration of the name and address of each person for whom they are "engaged in receiving wagers."[7] It is doubtless true that these provisions, as well as the occupational tax itself,[8] were designed at least in part to facilitate collection of the excise tax. It is likewise plausible to suppose, as the Government suggests, that the more participants in a gambling enterprise are swept within these provisions, the more likely it is that information making possible the collection of excise taxes will be secured. The fact remains, however, that Congress did not choose to subject all employees of gambling enterprises to the tax and reporting requirements, but was content to impose them on persons actually "engaged in receiving wagers." Neither we nor the Commissioner may rewrite the statute simply because we may feel that the scheme it creates could be improved upon.[9]

---

[7] See note 1, *supra.*

[8] H. R. Rep. No. 586, 82d Cong., 1st Sess. 60; S. Rep. No. 781, 82d Cong., 1st Sess. 118 (1951).

[9] We do not consider as illuminating, on the issue before us, the statement in the House and Senate Reports cited in note 8, *supra,* to the effect that "Enforcement of a tax on wagers frequently will necessitate the tracing of transactions through complex business relationships, thus requiring the identification of the various steps involved." This general statement, not necessarily referring to the numbers game or to mere delivery systems, as distinguished from arrangements for the "lay-off" of bets by gambling principals, is not helpful in interpreting § 3290 in relation to the numbers game and "pick-up men." Cf. *Federal Communications Commission* v. *Columbia Broadcasting System of Calif., Inc.,* 311 U. S. 132, 136. We think the same is true of the statements of Representative Reed, 97

We can give no weight to the Government's suggestion that holding the pick-up man to be not subject to this tax will defeat the policy of the statute because its enactment was "in part motivated by a congressional desire to suppress wagering." [10] The statute was passed, and its constitutionality was upheld, as a revenue measure, *United States* v. *Kahriger,* 345 U. S. 22, and, apart from all else, in construing it we would not be justified in resorting to collateral motives or effects which, standing apart from the federal taxing power, might place the constitutionality of the statute in doubt. See *id.,* at 31.

Finally, the Government points to the fact that the Treasury Regulations relating to the statute purport to include the pick-up man among those subject to the § 3290 tax,[11] and argues (a) that this constitutes an administrative interpretation to which we should give weight in construing the statute, particularly because (b) section 3290 was carried over *in haec verba* into § 4411 of the Internal Revenue Code of 1954. We find neither argument persuasive. In light of the above discussion,

---

Cong. Rec. 6896, and of Senator Kefauver, 97 Cong. Rec. 12231–12232, relied on by the Government. The significance of Senator Kefauver's statement is further limited by the fact that he was an opponent of the bill. See *Mastro Plastics Corp.* v. *Labor Board,* 350 U. S. 270, 288.

[10] See 97 Cong. Rec. 6892, 12236, referred to in *United States* v. *Kahriger,* 345 U. S. 22, 27, n. 3.

[11] Treas. Reg. 132, § 325.41, Example 2 (26 CFR, 1957 Cum. Pocket Supp.), which was issued on November 1, 1951 (16 Fed. Reg. 11211, 11222), provides as follows:

"B operates a numbers game. He has an arrangement with ten persons, who are employed in various capacities, such as bootblacks, elevator operators, news dealers, etc., to receive wagers from the public on his behalf. B also employs a person to collect from his agents the wagers received on his behalf.

"B, his ten agents, and the employee who collects the wagers received on his behalf are each liable for the special tax."

we cannot but regard this Treasury Regulation as no more than an attempted addition to the statute of something which is not there.[12] As such the regulation can furnish no sustenance to the statute. *Koshland* v. *Helvering,* 298 U. S. 441, 446–447. Nor is the Government helped by its argument as to the 1954 Code. The regulation had been in effect for only three years,[13] and there is nothing to indicate that it was ever called to the attention of Congress. The re-enactment of § 3290 in the 1954 Code was not accompanied by any congressional discussion which throws light on its intended scope. In such circumstances we consider the 1954 re-enactment to be without significance. *Commissioner* v. *Glenshaw Glass Co.,* 348 U. S. 426, 431.

In conclusion, we cannot accept the alternative reasoning of the dissenting judge below who, relying on that part of the opinion in *Daley* v. *United States,* 231 F. 2d 123, 128, relating to the trial court's charge to the jury in a prosecution for failing to pay the § 3285 excise tax,[14]

---

[12] Apart from this, the force of this Treasury Regulation as an aid to the interpretation of the statute is impaired by its own internal inconsistency. Thus, while Example 2 of that regulation purports to make the pick-up man liable for the § 3290 occupational tax, Example 1 of the same regulation provides that "a secretary and bookkeeper" of one "engaged in the business of accepting horse race bets" are not liable for the occupational tax "unless they also receive wagers" for the person so engaged in business, although those who "receive wagers by telephone" are so liable. Thus in this instance a distinction seems to be drawn between the "acceptance" of the wager, and its "receipt" for recording purposes. But if this be proper, it is not apparent why the same distinction is not also valid between a writer, who "accepts" or "receives" a bet from a numbers player, and a pick-up man, who simply "receives" a copy of the slips on which the writer has recorded the bet, and passes it along to the banker.

[13] See note 11, *supra.*

[14] See the dissenting judge's opinion below, 236 F. 2d 182, 185–186. The sufficiency of the instructions to the jury in *Daley* apparently

regarded the respondent's conviction here as sustainable also on the theory that he was a person "engaged in the business of accepting wagers" within the meaning of § 3285 (d). The Government disclaims this ground for upholding the respondent's conviction, as indeed it must, in light of the unambiguous legislative history showing that the excise tax applies only to one who is "engaged in the business of accepting wagers" as a "principal . . . on his own account." [15] In this instance, that means the banker, as the Government concedes.

We hold, therefore, that the occupational tax imposed by § 3290 does not apply to this respondent as a pick-up man, and that the judgment below must accordingly be

*Affirmed.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of this case.

MR. JUSTICE BURTON, dissenting.

For the reasons stated in *Sagonias* v. *United States,* 223 F. 2d 146, I believe that the respondent pickup man was "engaged in receiving wagers for and on behalf" of the banker, within the meaning of §§ 3290 and 3291 (a)(3), and therefore was required to pay the occupational tax and to register not only his name and place of residence, but that of the banker.

---

was not challenged on appeal. In any event, the *Daley* case was not concerned with a pick-up man, nor was the legislative history quoted at p. 356, *supra,* brought to the court's attention. The court in the *Sagonias* case, *supra,* which accepted the Government's contention as to the meaning of "receiving wagers," rejected the construction of the statute embodied in the instructions to the jury quoted in *Daley.*

[15] See p. 356, *supra.*

The language of § 3290 does not limit the occupational tax to persons "accepting wagers" in a contractual sense. Instead, it imposes the tax on "each person . . . who is engaged in receiving wagers for or on behalf of any person so liable [for the excise tax]." Those words readily include a pickup man for he is engaged in receiving for the banker the slips which provide the banker with the sole evidence of the wagers made.

The legislative history contains specific references that indicate that the section was to apply to bookmakers' agents or runners.[1] It shows that the occupational tax was enacted not only as a revenue measure on its own account, but as a measure to help enforce the much larger excise tax placed by § 3285 upon the principal operator of the gambling enterprise.[2] To this end, § 3291 (a)(1) and (3) requires each person who is subject to the occupational tax to register not only his own name and place of residence, but also that of the person for whom he is receiving wagers. Registration of the pickup man aids the Government in tracking these gambling operations to their headquarters and is essential to the enforcement of the excise tax. Since the "receiving wagers" phrase in the registration provisions includes the pickup man, it must have the same meaning in the identical provisions imposing the occupational tax.

Furthermore, the administrative interpretation of § 3290 is significant. Since the enactment of the section

---

[1] H. R. Rep. No. 586, 82d Cong., 1st Sess. 56; S. Rep. No. 781, 82d Cong., 1st Sess. 114; 97 Cong. Rec. 6896 (Representative Reed); id., at 12231–12232 (Senator Kefauver). In this connection, it should be noted that the opinion of the court below states that "The 'numbers banker', even as bankers and brokers in reputable commerce, employs salaried *runners* and messengers. These couriers are called 'pick-up men.'" (Emphasis supplied.) 236 F. 2d 182, 184.

[2] H. R. Rep. No. 586, 82d Cong., 1st Sess. 60; S. Rep. No. 781, 82d Cong., 1st Sess. 118.

in 1951, there has been in effect the following explanation of its scope in Treasury Regulations 132:

> "*Example (2)*. B operates a numbers game. He has an arrangement with ten persons, who are employed in various capacities, such as bootblacks, elevator operators, news dealers, etc., to receive wagers from the public on his behalf. B also employs a person to collect from his agents the wagers received on his behalf.
>
> "B, his ten agents, *and the employee who collects the wagers received on his behalf* are each liable for the special tax." (Emphasis supplied.) 26 CFR, 1957 Cum. Pocket Supp., § 325.41.

This regulation should not be disregarded unless shown to be plainly inconsistent with the statute. *Commissioner* v. *Wheeler,* 324 U. S. 542, 547; *Brewster* v. *Gage,* 280 U. S. 327, 336. Moreover, Congress re-enacted § 3290 in 1954 as 26 U. S. C. (Supp. II) § 4411. It thus impliedly accepted this established interpretation of the scope of the section. *Corn Products Refining Co.* v. *Commissioner,* 350 U. S. 46, 53; *Helvering* v. *Winmill,* 305 U. S. 79, 83.