UNITED STATES of America

v.

Pat DiPRIMIO and Daniel Panichella.

No. 62–95.

United States District Court
W. D. Pennsylvania.

Oct. 1, 1962.

Joseph S. Ammerman, U. S. Atty., Pittsburgh, Pa., for the United States.

Charles E. Marker, Greensburg, Pa., for defendant.

## 138

DUMBAULD, District Judge.

There is no better description of the Internal Revenue laws in general than that contained in the often-quoted language of Judge Learned Hand:

"In my own case the words of such an act as the Income Tax, for example, merely dance before my eyes in a meaningless procession: cross-reference to cross-reference, exception upon exception—couched in abstract terms that offer no handle to seize hold of—leave in my mind only a confused sense of some vitally important, but successfully concealed, purport, which it is my duty to extract, but which is within my power, if at all, only after the most inordinate expenditure of time. I know that these monsters are the result of fabulous industry and ingenuity, plugging up this hole and casting out that net, against all possible evasion; yet at times I cannot help recalling a saying of William James about certain passages of Hegel: that they were no doubt written with a passion of rationality; but that one cannot help wondering whether to the reader they have any significance save that the words are strung together with syntactical correctness." [1]

The same complexity carries over into the so-called "gambling tax" provisions of the Internal Revenue laws.

These provisions, it is well known, were added for the purpose of discouraging professional gambling rather than of raising revenue. Investigations conducted by Senator Estes Kefauver of Tennessee and by Robert F. Kennedy, the present Attorney General, have disclosed the widespread extent and the sinister influence of gambling in the nation's life. The public has been shocked to learn the magnitude of the tremendous revenue or "take" therefrom which is at the disposal of criminals for purposes of political corruption or of obtaining control of legitimate business enterprises.

Much of this enormous income, for the most part derived from activities carried on in defiance of State law, has escaped paying federal income tax because of the difficulties of enforcement. Consequently, Congress took action to protect the public interest, and enacted certain special "gambling tax" provisions.

 But the courts are not concerned with the motives of Congress, whatever they may have been, so long as it does not transcend its legislative powers; and it is no objection to the exercise of the federal commerce power or taxing power that its exercise may be "attended by the same incidents which attend the exercise of the police power." United States v. Darby, 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941); United States v. Kahriger, 345 U.S. 22, 27–28, 73 S.Ct. 510, 97 L.Ed. 754 (1953). The latter case upheld the constitutionality of the "gambling tax" provisions, although three Justices dissented, and Mr. Justice Frankfurter contended that the legislation sought to wrap in the "verbal cellophane" of a revenue measure a statute intended "not to raise revenue but to regulate conduct." 345 U.S. at 37–38, 73 S.Ct. at 517.

The "gambling tax" provisions were further construed and clarified in United States v. Calamaro, 354 U.S. 351, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957).

The information in the case at bar contained three counts. The first charged wilful failure to pay a federal tax, in violation of 26 U.S.C. § 7203 which reads as follows:

"Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015 or section 6016), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply

1. Learned Hand, "Thomas Walter Swan", 57 Yale L.J. 167, 169.

such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution."

This is a general provision applicable to many kinds of tax (including income tax), and not limited to failure to pay taxes arising under the "gambling tax" provisions of the Internal Revenue law.

The second count charged each defendant with the offense of failure to register with the Internal Revenue Service as required by 26 U.S.C. § 4412,[2] such failure being subjected to a penalty of $50 by 26 U.S.C. § 7272.[3]

The third count purported to charge violation of 26 U.S.C. § 7262 which provides that: "Any person who does any act which makes him liable for special tax under [26 U.S.C. § 4411] without having paid such tax, shall, besides being liable to payment of the tax, be fined not less than $1,000 and not more than $5,000."

The special tax under 26 U.S.C. § 4411 (liability for which carries with it the duty of registration[4]) is a flat annual tax of $50 payable by persons who are liable for tax under 26 U.S.C. § 4401, or who are "engaged in receiving wagers for on on behalf of any person so liable."[5]

Turning now to 26 U.S.C. § 4401, we find that it imposes what is commonly called an "excise" tax of 10% as distinguished from the "special tax" imposed by 26 U.S.C. § 4411 which gives rise to the duty of registration prescribed by 26 U.S.C. § 4412.

The "excise tax" provision of 26 U.S.C. § 4401 reads as follows: "There shall be imposed on wagers, as defined in section 4421, an excise tax equal to 10 percent of the amount thereof." It is further provided that "Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery."

The "house that Jack built" is completed by noting the inclusions and exclusions ordained by the definition given by 26 U.S.C. § 4421.[6]

We are particularly concerned in the case at bar with the express inclusion of the "numbers" racket; and with the express exclusion of "any game of a type

---

2. 26 U.S.C. § 4412 provides that "Each person required to pay a special tax under this subchapter shall register with the official in charge of the internal revenue district" certain data including information regarding the 10% excise tax levied on gambling by 26 U.S.C. § 4401.

3. 26 U.S.C. § 7272 provides that "Any person who fails to register with the Secretary or his delegate as required by this title or by regulations issued thereunder shall be liable to a penalty of $50."

4. See 26 U.S.C. § 4412, set forth in note 2 supra. It will be noted that the penalty for non-registration imposed by 26 U.S.C. § 7272 is the same as the amount of the tax imposed by 26 U.S.C. § 4411. See note 3 supra.

5. 26 U.S.C. § 4411 provides that: "There shall be imposed a special tax of $50 per year to be paid by each person who is liable for tax under section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable."

6. "For purposes of this chapter—
 "(1) The term 'wager' means—

 * * *

 "(C) any wager placed in a lottery conducted for profit.
 "(2) The term 'lottery' includes the numbers game, policy, and similar types of wagering. The term does not include

 ---

 "(A) any game of a type in which usually
 "(i) the wagers are placed,
 "(ii) the winners are determined, and
 "(iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game * * *."

in which usually (i) the wagers are placed, (ii) the winners are determined, and (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game."

The third count of the information (charging violation of 26 U.S.C. § 7262) was withdrawn from the jury by the Court for the reason that as a matter of pleading it did not contain a direct allegation stating a crime.

Recapitulating, then, each of the two defendants was charged under the first count with *wilful* failure to pay a tax; and under the second count with failure to register. The duty to register, it will be remembered, is predicated upon the duty to pay the "special tax" imposed by 26 U.S.C. § 4411, not the "excise tax" imposed by 26 U.S.C. § 4401; and the special tax is payable by only two classes of persons: (a) those liable for the excise tax imposed by 26 U.S.C. § 4401; and (b) those engaged in receiving wagers for or on behalf of any person so liable.

To convict either defendant under the second count, therefore, it must be proved to the satisfaction of the jury beyond a reasonable doubt that such defendant either:

(a) was engaged in the business of accepting wagers or conducting a wagering pool or lottery [26 U.S.C. § 4401(c)]; or

(b) was engaged in receiving wagers for or on behalf of any person so liable [26 U.S.C. § 4411].

In other words, as explained in United States v. Calamaro, 354 U.S. 351, 353–357, 77 S.Ct. 1138, 1 L.Ed.2d 1394 (1957), in a "numbers" case only the "writer" and the "banker" are liable to the special tax, while the "pick-up man" and other intermediaries are not.

The jury's verdict of guilty under the second count against both defendants evidently reflects their conclusion that insofar as the "tip sheet" operation was concerned, the proprietor, di Primio, was engaged in the business of accepting wagers or conducting a lottery as a principal, under (a); whereas the bartender, Panichella, was engaged in receiving wagers for di Primio under (b). To sustain the verdict the Court must determine as a matter of law that the "tip sheet" activities were "wagers" or a "lottery" within the meaning of the statutory definition.

■ It is not necessary that the information allege that defendant di Primio was conducting a lottery.[7] The offense charged is simply failure to register, and this is adequately charged. Proof that the operations amounted to a "lottery" is not a variance, but simply a necessary element of the Government's case. In order to establish the duty to register, by reason of the intricate incorporations by reference in the statute, reminiscent of Judge Learned Hand's language quoted earlier,[8] the Government must prove that a "lottery" within the meaning of the statutory definition was being conducted.

The evidence in the case at bar, if accepted by the jury, sufficed to make a plain case against the bartender (defendant Panichella) that he was a "numbers" writer. There was no evidence against the proprietor (defendant di Primio) as to the "numbers" charge. However, with respect to what is called "tip sheets" there was ample evidence that the proprietor was responsible for an active business of that character, and that the bartender actively engaged in selling "tips".

A "tip sheet" is a paper containing numerous concealed numbers, each of which is sold separately to a customer for 25 cents. The customer after buying his number tears it off and opens it up and finds out what his number is. One lucky number on the sheet is the winning number, and entitles the customer to a prize of $10. If all the numbers on the

7. As contended in Defendant's Brief, pp. 11–12.

8. See note 1 supra.

sheet are sold, the proprietor's profit (after deducting the $10 prize) is $2.50.

Defendants strenuously argue that this type of operation does not constitute a "lottery conducted for profit" as defined by 26 U.S.C. § 4421, and that, on the contrary, it falls within the exclusion provisions of 26 U.S.C. § 4421(2) (A).

The latter argument would be sound if it were supported by the evidence. If it were true that in this type of operation the "tips" were usually all purchased at one time, and the winner were determined and the pay-off made while all the customers were still present, the activity would qualify for exclusion, just as a poker or dice game or roulette wheel qualifies. (With the wisdom of the statutory definition, as a matter of policy, courts are not concerned.)

But the evidence shows that customers buy their "tips" at different times, and the sheet remains on sale for several days until all the numbers are sold, and then the winner may return on another occasion and collect his prize money. There is no inherent feature in this type of game, as there is in poker, dice, or roulette, which requires that the bets, the play-off, and the pay-off take place *uno ictu* on the same occasion in the presence of all the participants in the play.

The Court reserved this point at the trial, and has since heard argument of counsel. Counsel earnestly contend that here, unlike "numbers" play, it is not possible to "break the bank"; that the operator is not betting against the customers but that they are betting against each other; that the operator has no control over the outcome; and that the operator's profit is fixed and not variable or aleatory.

In the case of "tip sheets" the *selection of his number* by the customer is controlled by chance, whereas in the "numbers" racket the number played is voluntarily selected. Other players may play the same number, and if many "hit" simultaneously the "banker" may be unable to meet his obligations. The extent of the banker's liability in "numbers" is variable and fluctuating; in "tip sheet" play the amount of the prize is predetermined and fixed. The winning number is also predetermined.

But we do not feel that these circumstances lead to the legal conclusion that "tip sheet" play is not a lottery or aleatory game of chance.

The fundamental feature common to both activities is that the customer and the operator wager against each other as to whether there will, or will not, be an *identity* or coincidence between the customer's number and the winning number. It is immaterial that in the one case the customer's number is selected by chance while the winning number is predetermined; whereas in the other case the customer's number is voluntarily selected and predetermined, while the winning number is selected by chance. In both games the element of chance enters into the result, and determines whether or not the *identity* wagered upon shall come to pass.

Counsel likewise seek to distinguish "tip sheet" play from punchboards, which are understood to be within the definition of wagering. Lloyd v. Robinson, 110 F.Supp. 540, 541–42 (D.Montana 1952). The distinction is drawn that in the case of a punchboard, having multiple predetermined winning numbers each corresponding to a prize, the winning numbers are announced at the outset of play, and a customer knows at once whether the number he draws is or is not one of the winners. As we understand the rationale of the Robinson case, it would seem that if a punchboard where a prize can be won in a single transaction is a lottery, *a fortiori* must that result be true where, as in the case of "tip sheet" play, further play is necessary before the winner can be ascertained. Such further play, we have seen that the evidence shows, does not ordinarily take place in the presence of all the participants so as to fall within the statutory exclusion.

We therefore conclude that the Court's instructions to the jury were correct,

and that to conduct "tip sheet" play, as the defendants did, was a wagering activity or lottery as defined by 26 U.S.C. § 4421. Hence it follows that they were liable to pay the special tax, hence under a duty to register. The jury's verdict of guilty against each defendant under the second count must therefore stand.

The jury acquitted defendant Panichella (the bartender) under the first count, but found the proprietor (di Primio) guilty. Unless the jury confused the names of the defendants (as the Court, we must confess, did at one point in drafting this opinion), we must assume that the jury did not give credence to the plain testimony of the enforcement agent who testified that he played a number with the bartender Panichella. Against the proprietor (di Primio) there was no evidence of participation in "numbers". Therefore the Court would be inclined to disregard the numbers charge in considering the case of defendant di Primio, since the jury disregarded it with respect to the defendant actually implicated.

Therefore we must ask whether the proprietor di Primio should be punished for 'wilful' failure to pay the special tax due by reason of the "tip sheet" play.

This defendant's testimony shows that he was familiar with the law regarding registration and gambling taxes; and that he did not wish to engage in any activity which would render his establishment liable for taxes requiring registration.

■ Whether "tip sheets" were such an activity we regard as a debatable question, in the light of the vigorous contentions of counsel. The fact that we do not find those contentions convincing does not alter the fact that an appellate court might take a different view. The issue is apparently *res integra*. No court decisions have been cited where the point arose. Hence we feel that this defendant's belief that no tax was due was not arbitrary or unreasonable or held in bad faith. Accordingly we think that he should be punished in accordance with the scale of punishment established by 26 U.S.C. § 7262 (fine of $1000 to $5000) rather than that established by 26 U.S.C. § 7203 (fine of not more than $10,000, or imprisonment not more than one year, or both).

The penalty for a wrong guess ought to be more than $50. 26 U.S.C. § 7262 automatically attaches a substantial fine, which this defendant should pay if the Court's view of the law is correct.

However, the count under 26 U.S.C. § 7262 was withdrawn from the case because of a defect in pleading.

But as a practical matter the greater includes the less, and if counsel for defendant become convinced that this Court is correct with respect to the issue of liability for "tip sheet" activities, and will stipulate that the defendant di Primio may be sentenced under the verdict of guilty under the first count to such sentence as might have been imposed under the third count if it were applicable, it would eliminate the necessity of a reindictment of said defendant for the offense attempted to be charged in the defective third count.

We therefore shall deny all defendants' motions and defer sentence under the first count, and direct both defendants to appear for sentence under the second count; after which counsel may consider whether to take an appeal from such sentence, or to stipulate as suggested with regard to the first count, or to take such other steps as they may deem available and appropriate.

## ORDER

AND NOW, this 1st day of October, 1962, after argument, IT IS ORDERED that defendants' motion for judgment of acquittal, for arrest of judgment, and for new trial be and the same hereby are overruled and refused; and that sentence of the defendant di Primio under the first count of the indictment shall be deferred until further order of court, and that defendants Panichella and di Primio shall appear for sentence under the second count thereof.