UNITED STATES of America, Appellant,

v.

T. D. BOWEN, Appellee.

No. 26148.

United States Court of Appeals Fifth Circuit.

May 12, 1969.

---

Edward F. Boardman, U. S. Atty., Tampa, Fla., Eugene P. Kopp, Tax Division, Dept. of Justice, Washington, D. C., Mitchell Rogovin, Asst. Atty. Gen., Meyer Rothwacks, Lee A. Jackson, John M. Brant, Elmer J. Kelsey, Attys., Tax Division, U. S. Dept. of Justice, Washington, D. C., for appellant, Robert B. McGowan, Asst. U. S. Atty., of counsel.

William R. Frazier, Jacksonville, Fla., for appellee.

Before PHILLIPS,* BELL and MORGAN, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

This action was instituted by Bowen to recover a refund of excise wagering taxes, penalties, and interest paid by him. From a judgment in favor of Bowen, the United States has appealed.

The following facts, *inter alia*, were agreed to by a written pretrial stipulation.

From December 1, 1951, to May 31, 1952, Bowen was associated with a lottery operation, known as bolita, in Polk County, Florida. In July 1954, the Commissioner of Internal Revenue, under the provisions of § 3285 of the Internal Revenue Code of 1939 (26 U.S.C. 1952 ed., § 3285), made an assessment of excise wagering taxes, penalties, and interest, aggregating $37,947.51, against Bowen, Theo Lelekis, Manuel Fernandez, Henry Barnhill, Santo Trafficante, Jr., and Sam C. Trafficante. Bowen made payments thereon, as follows:

| | |
|---|---|
| January 21, 1960 | $ 4,800.00 |
| February 6, 1961 | 5,200.00 |
| September 12, 1961 | 23,000.00 |
| August 30, 1962 | 21,483.11 |
| | |
| Total paid | $54,483.11 |

Other persons made payments in 1957 and 1960, aggregating $1,095. The aggregate of all of such payments satisfied in full the original assessment, accrued interest, a nonpayment penalty, and a lien fee.

Bowen's action was predicated on the claim that he was not a "person * * * engaged in the business of accepting wagers," nor a "person who" conducted "any wagering pool or lottery," within the meaning of those phrases in § 3285 (d) of the Internal Revenue Code of 1939.

From a judgment on a jury verdict in favor of Bowen for $54,483.11, with interest on each payment made by him from the date it was made at 6 per cent per annum, the United States has appealed.

The United States made a motion for a directed verdict in its favor at the close of all the evidence, and after the verdict was returned for a judgment in its favor n. o. v., which were denied.

In determining whether such motions should have been granted, we must view the evidence in a light most favorable to Bowen and give him the benefit of all favorable inferences that reasonably may be drawn therefrom.[1]

---

* Of the Tenth Circuit, sitting by designation.

1. Anderson v. Hudspeth Pine, Inc., 10 Cir., 299 F.2d 874, 876; Kippen v. Jewkes,

So viewed, the evidence affords substantial support for these facts:

On and prior to December 1, 1951, up to and including May 31, 1952, Barnhill carried on a lottery operation, known as bolita, in Winter Haven, Florida, and the area adjacent thereto.

At all times here material, Bowen was a resident of Winter Haven, Florida. On and prior to December 1, 1951, he was a citrus fruit dealer. He purchased citrus fruit on the trees, harvested it, sold it to processors, and delivered it to them at their plants. Because of a large decrease in the price of oranges in 1951, Bowen suffered heavy financial losses. He testified that he was "broke" and owed three personal friends about $7,000.

Barnhill, knowing of Bowen's financial plight, contacted Bowen and asked him if he would "check the bolita each week for him," stating he would "give" him "$50 a week expenses and twenty-five percent of the profits, if and when there were any." Because the law enforcement officers knew Barnhill was engaged in bolita operations, he wanted someone with a good reputation and free from suspicion to serve as checker. Bowen had a good reputation. It is in the checking of the bolita tickets that a bolita operator is most likely to be "caught" by law enforcement officers.

A bolita operation, or numbers game, is ordinarily carried out by four individuals, each of whom performs a different function. They are:

The "operator," or head of the group, who is sometimes called the "banker," and who finances the operation and employs the other members of the group and against whom the players bet; the "writer," who for the operator does the actual selling of the tickets to players, and who records on triplicate slips the number or numbers sold to each player, the amount of his wager or wagers, gives one copy to the player, retains one copy of each slip, and delivers the other copy to a "pick-up" man; the "pick-up" man, who picks up the tickets from the writer, puts them in a paper bag, and drops it off at a designated "spot," made known to a "checker"; and the "checker," who on each Saturday morning picks up the bag of tickets, obtains the winning numbers by a short-wave radio broadcast of the Cuban National Lottery, which determines the winning bolita numbers, and checks the "hits," or winning numbers, tabulates them on a check-up list, and delivers it to the operator or banker, who then gives the money to the writer to pay off the winning players. In some instances, two or more persons perform one of such separate functions.

In the instant case, Barnhill was the operator of the bolita game at Winter Haven, Florida, and normally paid off the winners through the writers from funds won, but when he suffered a "losing streak," even though the odds were 70 to 1, and needed additional funds to pay off the winners, such funds were provided by the Trafficantes, who are referred to in the record as the bankers. Under the arrangement, Bowen and Barnhill were each to receive 25 per cent of the net profits and the Trafficantes

10 Cir., 258 F.2d 869, 873; Continental Baking Co. v. Utah Pie Co., 10 Cir., 349 F.2d 122, 147, reversed on other grounds, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406.

In Boeing Co. v. Shipman, 5 Cir., 411 F.2d 365 (1969) this court said:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider *all* of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fairminded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. * * *."

were to receive 50 per cent. The funds advanced by the Trafficantes were to be repaid from future winnings, before a future net profit could be distributed. There was no personal obligation on the part of Barnhill, or any other person, to personally reimburse the Trafficantes for any advances made by them. They could only recoup their advances from future earnings.

The writers were paid 15 percent of the amount received from tickets which they sold.

Having accepted Barnhill's offer, Bowen rented a room in a cabin from one O'Neal, whom he knew, for $10 per week. O'Neal lived in the cabin, which was located in a small citrus orchard owned by C. B. Reeves.

On each Saturday, Bowen would meet Manuel Fernandez, a resident of Tampa. Together, they would pick up the tickets, which had been left at a spot designated by the pick-up man, and take them to the cabin, where there was a strong box and a short-wave radio set. Fernandez spoke and understood Spanish, and would obtain that week's winning numbers in the Cuban National Lottery over the short-wave radio. The winning Cuban Lottery numbers were the winning bolita numbers. Fernandez and Bowen would then check the tickets and tabulate the winning tickets. Fernandez made out a check-up list, which set forth the amount of money each writer took in, the number of winners on tickets he sold, and his net winnings or losses for the week. Bowen checked to see if the hits were correctly tabulated and if the check-up lists were made out correctly. Bowen would then deliver the check-up lists to Barnhill, who would disburse the funds to the writers to pay off the winners. Fernandez brought the money from Tampa to pay O'Neal.

Lelekis was a checker for the Trafficantes, as also apparently was Fernandez. The record indicates that the Trafficantes operated a bolita game in Tampa, or the vicinity thereof. Lelekis ac-companied Bowen and Fernandez when they picked up the bags of tickets and took them to the cabin. It is fairly inferable from the record that the Trafficantes paid Fernandez and Lelekis.

Bowen had never sold any bolita tickets, directly or indirectly, never employed anyone to assist in carrying out any part of the bolita operation, and had no voice as to the manner or means by which it was carried out. He made no investment of any kind in the enterprise, nor was he in any way liable for any losses that occurred. He rendered services, which consisted of obtaining a room in which the checking was carried out, picking up, along with Fernandez, the sacks of tickets, and auditing Fernandez's checking of the winning tickets and the check-up lists which Fernandez made out.

■ It is clear that unless Bowen had a proprietary interest in the bolita operation, he was not liable for the wagering tax assessed against him.[2]

In his instructions to the jury, the trial court defined the meaning of the phrase "proprietary interest" and also advised the jury as to the meaning of the term "partnership." Counsel for the United States took no exception to that part of the court's instructions.

■ We think, under the evidence, the jury was warranted in finding that Bowen was merely an employee, serving as a checker and auditor, and that the 25 per cent of the net profits he was to receive, if and when made and distributable, was merely a means of measuring the compensation, in addition to the $50 a week, he was to receive for his services. From that they could properly conclude, as they did, that Bowen had no proprietary interest in the bolita operation.

Counsel for Bowen, near the end of the first day of the trial, on October 9, 1967, offered in evidence a pretrial discovery deposition of Fernandez, taken by the United States. Counsel for the United

---

2. See United States v. Calamaro, 354 U.S. 351, 352–356, 77 S.Ct. 1138, 1 L.Ed.2d 1394.

States objected on the ground that it had not been shown that Fernandez was not available as a witness and that Bowen had not made a bona fide effort to obtain his attendance.

Counsel for Bowen stated he had not caused Fernandez to be subpoenaed to appear as a witness, because Fernandez had expressed a willingness to attend the trial and testify. Bowen testified Fernandez had promised him he would appear and testify as a witness at the trial, and that Fernandez had been advised of the time and place of the trial.

Rule 26(d) (3) of the Federal Rules of Civil Procedure provides in part as follows:

"(3) The deposition of a witness, whether or not a party may be used by any party for any purpose if the court finds: * * * 4, that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; * * *."

Notwithstanding the promises made by Fernandez to appear and testify at the trial on behalf of Bowen, he had not appeared, and when the fact was made known to the court that Fernandez had promised to appear and testify as a witness, the court granted leave for counsel for Bowen to cause a subpoena to be issued and served on Fernandez. Thereupon, a subpoena was promptly issued and delivered to a Deputy United States Marshal, who made diligent efforts to serve the subpoena on the evening of October 9, 1967, and the following morning, but was unable to locate Fernandez. On the morning of October 10, 1967, counsel for Bowen advised the court of the inability of the officer, after diligent efforts, to serve the subpoena on Fernandez. At that time Bowen testified that on Sunday October 8, 1967, the day before the trial commenced, he had contacted Fernandez by telephone, and that Fernandez promised he would appear voluntarily at the trial and testify as a witness.

Thereupon, the court overruled the objection and permitted counsel for Bowen to read portions of the Fernandez deposition. However, the court required counsel to read the deposition in such a manner that it would not appear to the jury that the deposition was taken on behalf of the United States.

We are of the opinion that whether, under the existing circumstances, counsel for Bowen should have been permitted to read portions of the deposition of Fernandez to the jury, with safeguards as required by the court, was a matter resting within the sound discretion of the trial court, and that the trial court did not abuse that discretion.

Accordingly, the judgment is affirmed.