**UNITED STATES of America**

v.

**William SAMS et al.**

**Crim. A. No. 62–292.**

United States District Court
W. D. Pennsylvania.

July 18, 1963.

Gustave Diamond, U. S. Atty., Pittsburgh, Pa., Samuel J. Reich, Pittsburgh, Pa., trial atty., for the government.

Vincent M. Casey, Pittsburgh, Pa., for William Sams, Frank Phillips and Michael Giorano.

Irving M. Green, New Kensington, Pa., for Thomas Ciancutti.

DUMBAULD, District Judge.

Most of the points raised by defendants in their motion for new trial were timely raised by their able counsel at the trial, and ruled upon at that time.

There is one ground, however (relating to the mode of selection of the jury), which was not raised until the briefs and argument upon the motion for new trial. It is contended that the conviction is invalid for the reason that a judge and a court reporter were not present during the entire period when the jury was being selected. This is said to violate Criminal Rule 24 and 28 U.S.C.A. § 753(b).

With regard to this contention we believe that it is untimely made because it was not raised until this late stage in the proceedings. Had the defendants made a

timely indication that they considered it of importance that a judge or reporter be present, the situation could have been easily remedied. A judge was available, and a court reporter was available, in the event that a situation arose requiring their presence; and at any time the defendants could have obtained the presence of a judge or a court reporter if they had so desired.

The jury in the case at bar was selected in accordance with the long established practice of this Court. Counsel for the defense, who have had extensive experience in the trial of criminal cases in the Western District of Pennsylvania, were familiar with this practice and raised no objection in the case at bar to the use of the customary procedure.

Under the usual practice in this District, an experienced Deputy Clerk propounds to the jurors certain stock or standard questions which have been approved by the Court. Upon timely request, the Court will permit other appropriate questions, desired by counsel, to be put to the jurors. The entire selection procedure takes place in the presence of the defendant and his counsel, together with government counsel. Obviously this procedure complies fully with Criminal Rule 24.

The procedure followed in the Western District of Pennsylvania for selection of juries is one of the streamlined reforms designed to prevent wasteful frittering away of judge-power which have earned just and nation-wide commendation for Chief Judge Wallace S. Gourley in his administration of the docket of this busy metropolitan court. These achievements have been hailed by the Chief Justice of the United States in his address to the American Law Institute in 1962 and in the Certificate of Merit presented to Judge Gourley by Chief Circuit Judge Biggs at a banquet sponsored by the Trial Lawyers' Academy of Allegheny County on June 3, 1963. The jury selection procedure was fully described and explained in a paper by Judge Gourley at the Norfolk Seminar for newly-appointed federal judges in April, 1962, and by

the writer of this opinion at a similar Seminar at Dearborn, Michigan, in August, 1962. We remain fully convinced of its usefulness and propriety as a means of maximizing the efficiency of the Court's operation, while according full protection to the legal rights of litigants.

■ With respect to 28 U.S.C. § 753 regarding the duties of court reporters, it seems clear that this is an administrative provision which relates to the organization of federal courts. It does not directly confer any rights upon defendants. This section is found in that part of the Judicial Code which deals with the organization and staffing of District Courts. It follows a section dealing with clerks, and one dealing with law clerks and secretaries. It precedes one relating to the appointment of court criers, bailiffs, and messengers. It is our recollection of the origin and legislative history of this section that in 1944, as a result of lobbying by court reporters' organizations, legislation was enacted providing that reporters should receive a regular and fixed annual salary in lieu of the former practice of compensating them on a piecework basis by the sale of transcripts. As *quid pro quo* for this salary, it was necessary that the legislation elaborate the duties of the reporters.

The language of 28 U.S.C. § 753(b) upon which defendants rely really constitutes a job description for the position of court reporter, and specifies what the reporter must do in order to earn his prescribed compensation. These administrative or directory provisions do not confer any legal rights upon defendants. (Of course, if the absence of a transcript made it impossible to show that a defendant was represented by counsel at his arraignment or voluntarily entered a plea of guilty, or resulted in some other actual violation of his legal rights, the defendant could take advantage of this circumstance. But the mere lack of compliance *per se* with such an administrative provision would not inure to the benefit of a defendant.) In itself, and in the absence of relevance to some other situation of separate significance involv-

ing a defendant's rights, non-compliance with section 753(b) gives no better basis for a new trial than would a similar provision directing judges to wear robes, deputy marshals to wear a particular sort of uniform while on duty, or court criers to use a particular formula, or to station the American flag at a particular place in the courtroom.

■ A second conclusive reason why this ground does not suffice to invalidate the conviction of defendants in this case is the fact that defendants were not in any way prejudiced by reason of the manner in which the jury was selected, even if it be assumed *arguendo* that it was not selected properly. During the course of oral argument, counsel conceded that in fact there were no additional questions which defendants wished to put to the jurors and which they were prevented from putting by reason of the absence of a judge or court reporter, nor did any untoward or inflammatory incidents occur which called for recording. Since defendants did not wish for or request additional relief by reason of circumstances arising out of the procedure adopted for selecting the jury, it seems clear that their rights were in no way prejudiced.

A third completely conclusive reason which demonstrates the total lack of merit in the contention that plaintiffs are entitled to a new trial by reason of the jury selection procedure is the fact that defendants have expressly waived any defects with respect to this matter.

On the Clerk's record of the selection of the jury, there appears a written waiver, signed by each defendant, and attested by defendants' counsel, reading as follows:

"I do hereby waive the right to have the jury in this criminal proceeding selected in the presence of a member of the Court. I do hereby further state and certify that the jury was selected in the open assignment room of the Court and that I was present with my counsel during the whole of the period of time applied in the selection of the jury. I

do further certify that I am satisfied and agreeable to the procedure applied to the selection of the jury."

Furthermore, before the jury was sworn the trial judge inquired "Is this the jury that has been selected in another part of the building in the presence of the defendants and their counsel to the satisfaction of all parties?"

Thereupon counsel replied as follows:

"MR. REICH [for the Government]: Yes, your Honor.

"MR. CASEY: It is, your Honor.

"MR. COHEN: It is, your Honor.

"MR. GREEN: Yes, your Honor. ·

"THE COURT: Very well. Let the jury be sworn."

It has long been established that jury trial is a right of the accused, which may be voluntarily and intelligently waived; it is not a mandatory feature of the functioning of the judicial system. Patton v. United States, 281 U.S. 276, 296, 50 S.Ct. 253, 74 L.Ed. 854 (1930); Dumbauld, The Bill of Rights and What It Means Today, 67.

Upon these threefold independent grounds, each conclusive, we find that there is no merit to the eleventh-hour straw at which defendants gropingly clutch in seeking to challenge the method of selection of the jury.

Turning now in detail to the points which were timely raised, and ruled upon, at the trial, it will first be helpful to indicate the various offenses of which the respective defendants were convicted. The indictment in this case is a lengthy document involving fifty (50) counts and eighteen (18) defendants. Five defendants went to trial, of whom one (Andrew Mangini) was completely acquitted. Those convicted were William Sams, Thomas Ciancutti, Frank Phillips, and Michael Giorano. There were five different types of offense involved. There are 614 pages of Transcript. The evidence pictures an extensive gambling operation on the second floor of the Garibaldi Building in New Kensington. About 80 customers would be present at one time. Dice games were conducted on one side of the area, horsebets were taken at an enclosure on the other side. Slips captured at the raid showed a volume of business of $7973 for two days.

The first count was directed against Sams, Phillips, Mangini, and Ciancutti, and charged them with conspiring to defraud the United States of gambling tax revenue, in violation of 18 U.S.C.A. § 371. As stated above, defendant Mangini was acquitted. Sams, Phillips, and Ciancutti were convicted.

The second count charged Sams, Phillips, Mangini, and Ciancutti with wilful attempt to evade tax (to wit the 10% excise tax on gambling imposed by 26 U.S.C.A. § 4401) in violation of 26 U.S.C.A. § 7201. Here too Mangini was acquitted. Ciancutti was also acquitted. Sams and Phillips were convicted.

Counts 3 and 4 involved the defendant Phillips only. The charge was violation of 26 U.S.C.A. § 7206(1) which makes punishable the filing of a tax return which the subscriber does not believe to be true and correct as to every material matter. Each count related to a different period of time. Phillips was convicted on both counts.

Count 5 charged defendant Sams with violation of 26 U.S.C.A. § 7203, making punishable wilful failure to pay tax, to wit, the special gambling stamp tax of $50.00 imposed by 26 U.S.C.A. § 4411. [The distinction between the offenses charged in Counts 2 and 5, both of which involve the element of wilfulness, is explained by Mr. Justice Jackson in Spies v. United States, 317 U.S. 492, 497–499, 63 S.Ct. 364, 87 L.Ed. 418 (1943).]

Count 6 charged defendant Sams with violation of 26 U.S.C.A. § 7262 which provides that any person who does any act making him liable for the special gambling stamp tax without having paid such tax shall be subject to a fine of $1000 to $5000. The crime here charged, unlike that covered in Count 5, does not require proof of wilfulness.

Count 7 is also against defendant Sams, but charges wilful failure to pay

tax in violation of 26 U.S.C.A. § 7203 for a different period of time than was covered in Count 5. Count 8 also charges defendant Sams with violation of 26 U.S.C.A. § 7262 for a different period of time than was covered in Count 6. Sams was found guilty on all counts against him (Counts 1, 2, 5, 6, 7, and 8). So was Phillips (on Counts 1, 2, 3, and 4). Ciancutti was acquitted on Counts 2, 13, and 14, but was convicted on Counts 1, 15, 16, 17, and 18. Giorano was convicted on Count 42 but acquitted on Count 41.

Recapitulating, the first count—that is the conspiracy to defraud the United States of tax in violation of 18 U.S.C.A. § 371—resulted in the conviction of three defendants: Sams, Phillips, and Ciancutti.

The second count—that is wilful attempt to evade tax in violation of 26 U.S.C.A. § 7201—resulted in the conviction of two defendants, Sams and Phillips. Ciancutti was acquitted under this count.

One defendant alone, Frank Phillips, was convicted under Counts 3 and 4 for wilful filing of a false tax return in violation of 26 U.S.C.A. § 7206(1).

Defendant Sams was found guilty under Counts 5 and 7 for violation of 26 U.S.C.A. § 7203, making punishable wilful failure to pay tax. Ciancutti was acquitted of this offense under Count 13 but was convicted under Counts 15 and 17, covering different periods of time. Giorano was acquitted of this offense under Count 41.

Defendant Sams was convicted of violation of 26 U.S.C.A. § 7262, punishing performance of taxable conduct without paying the tax, under Counts 6 and 8. Ciancutti was acquitted of this same offense under Count 14, but convicted under Counts 16 and 18, covering different periods of time. Giorano was convicted of the same offense under Count 42.

In other words Sams was found guilty on Counts 1, 2, 5, 6, 7, and 8. Ciancutti was found guilty on Counts 1, 15, 16, 17, and 18; but not guilty on Counts 2, 13, and 14. Phillips was found guilty on Counts 1, 2, 3, and 4. Giorano was ac-quitted on Count 41 and convicted on Count 42.

The other counts of the indictment involved other individuals, mostly minor employees of the establishment, who did not stand trial. These counts were disposed of on guilty pleas. Sentences were imposed on these counts on July 16, 1963, amounting to $41,000 in fines.

We examine now the contentions urged by defendants. The first point advanced is that there is said to be no proof that the sports event or contest upon which the defendants accepted or received bets (namely, horse races) in fact took place or occurred. This contention is now limited to the conviction of the defendant Giorano on Count 42 for violation of 26 U.S.C.A. § 7262 and the conviction of defendant Sams on Counts 5, 6, 7, and 8 for violation of 26 U.S.C.A. § 7262 and 26 U.S.C.A. § 7203. It is conceded that there happened to be on the premises at the time of the raid certain racing journals which sufficiently showed that the races upon which the other defendants accepted or received bets, as evidenced by the slips found on the premises by the Government agents, had in fact taken place. (Tr. 485). The argument turns upon the construction of 26 U.S.C.A. § 4421 defining the term "wager".

We are still skeptical with respect to the interpretation of 26 U.S.C.A. § 4421 which defendants advance. We cannot judicially construe the legislation of Congress by adding requirements which Congress did not specify. The statutory language reads: "The term 'wager' means any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers". No occurrence after the *placing* of the wager enters into or qualifies the definition. The statute does not specify when or how the event or contest is to be conducted. A past event, as well as one in the future, could be the subject of a wager under this language. Even if the races were run with toy horses and the winner determined by use of a mechanical device, the defendants

would not be immune from the gambling tax unless they qualified for exemption under the provision which states that "The term [lottery] does not include (A) any game of type in which usually (i) the wagers are placed, (ii) the winners are determined, and (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game." There was no evidence in this case from which the jury could rationally conclude that the horse bets of defendant Giorano, or any of the other defendants, fell within the scope of this exemption provision.

■ We likewise find no merit in defendants' contention that only cash bets constitute a violation of the gambling tax laws, and that bets on credit are exempt.

Defendant Phillips was convicted on Counts 3 and 4 for violation of 26 U.S. C.A. § 7206(1). The offense here charged was making a false statement. Phillips did file an application showing his place of business as 1809 Fourth Avenue, Arnold, Pennsylvania, and showing no employees or agents engaged in receiving wagers on his behalf. Defendants' contention is that the word "solely" did not appear in the application, and therefore that there was no falsity in his statement by reason of its failure to show that he was also engaged in taxable gambling at the Garibaldi Building and its failure to state that he did have employees working for him at the Garibaldi Building.

■ The abundant evidence showing that defendant Phillips was active and indeed claimed to be in charge of operations at the Garibaldi Building (Tr. 202) was ample to warrant a finding by the jury that his tax stamp application sedulously excluding any mention of activities at the Garibaldi Building was tainted with wilful falsehood.

■ The second count charges a wilful attempt to defeat and avoid the ten per-cent excise tax on gambling imposed by 26 U.S.C.A. § 4401 for the month of August, 1961. A return was filed by Phillips on October 11, 1961. On that date the Government had possession of the papers seized at the raid on August 24, 1961, but defendants did not request access to any papers or an extension of time to file in order to examine them before making out the return. The tax due as stated in the return was $320.00 (Tr. 21).

A computation by a Government witness showed that there was taxable business for two days in August, 1961, of $7973.00, as evidenced by slips seized on the premises at the raid on August 24, 1961. This business alone would have called for a tax of $797.30 for the month of August (Tr. 489–91).

If the volume of business done in two days resulted in a tax greater than twice the entire tax reported for the whole month of August, it is clear that the jury was fully warranted in finding that both Phillips and Sams, who were shown by the evidence to have actively participated in the management of the horse racing office, were necessarily aware that the extent of their tax liability was being systematically and purposefully understated and concealed. The filing of the return by Phillips on October 11, 1961, could therefore be viewed as a wilful device to defeat the collection of the tax that was due to the Government.

■ It is further contended that there was no evidence showing that Sams had a proprietary interest in the establishment. It is apparently conceded that Phillips did. Indeed, there are indications that he was being put forward as the "front man" or "fall guy" for the operation. Cf. United States v. Shaffer, 291 F.2d 689, 692 (C.A.7, 1961). However, the testimony connecting Sams with the operation of the establishment is sufficient to warrant the jury's finding of proprietorship. It was shown that he handled the money on pay-offs; that he accepted bets; that he scolded the doorman for inattentiveness to his work; that he closed down the dice game when there was not enough "action"; and that he attended meetings at the Ken-mawr Hotel where other persons from the Garibaldi Building were present. (Tr. 155, 174–177).

At the request of the Government, as a matter of precaution, the jury was specifically instructed "that you may return verdicts of guilty only against those defendants charged under those counts [Counts 1 and 2] that you find to have had a proprietary interest in the wagering operations subject to the definition of wagers as previously given". (Tr. 701–704). This instruction was given in view of Ingram v. United States, 360 U.S. 672, 676–680, 79 S.Ct. 1314, 3 L.Ed. 2d 1503 (1959). This instruction was more favorable to the defendants than necessary. We view the Ingram case merely as holding that in that case there was not sufficient evidence to show that the employees there concerned had knowledge of their employers' tax liability or engaged in a conspiracy to defeat its payment. The case does not actually hold that employees cannot under any circumstances be co-conspirators in such a conspiracy, or that only persons having a proprietary interest in the business can be such co-conspirators. In any event the conviction of Sams, Phillips, and Ciancutti on Count 1, in the light of the instructions given, if it be thought that a proprietary interest is requisite, may be taken as a finding that the jury found the necessary proprietary interest in these three defendants.

■ In the Ingram case the employees who were held not to be co-conspirators were not themselves subject to any of the taxes involved. They were clerical employees in a "numbers" business, and were neither "writers" nor "bankers". 360 U.S. at 675, 79 S.Ct. at 1317. Hence they were not subject to tax. United States v. DiPrimio, 209 F. Supp. 137, 140 (W.D.Pa., 1962). In the case at bar, however, each of the defendants convicted for conspiracy (except Ciancutti) was shown to have accepted or received bets himself. Hence such individuals would themselves be liable for the special stamp tax imposed by 26 U.S. C.A. § 4411. That tax is imposed both upon persons liable for the ten percent excise tax under 26 U.S.C.A. § 4401 as proprietors or principals and also upon persons engaged as agents in receiving wagers for or on behalf of any person so liable. Both the person who "accepts" and the person who "receives" wagers is liable for this tax. Hence the mere fact that the defendants in case at bar might have been employees instead of proprietors would not necessarily have excluded them as co-conspirators engaged in an attempt, *inter alia*, to defeat their own tax liability. Count 1 specifically alleges conspiracy to defraud the Government of tax revenue due under 26 U.S.C.A. § 4411 as well as under 26 U.S.C.A. § 4401.

■ It now remains to discuss the particular position of the defendant Ciancutti. Primarily he was engaged in conducting a dice game, which was concededly not subject to federal tax, by reason of the above-quoted exemption provisions in the definition of "wager". However, the testimony showed that he had free access to the railed-in area or enclosure behind the counter in the horse office, which was restricted to certain individuals (Tr. 143–44, 390, 397). He was also seen to handle money and to provide money for the operation of the horse office and to assist Sams and Phillips in going over the horse-bet slips. (Tr. 178–79). He met regularly with others at the Ken-mawr Hotel (Tr. 192). Ciancutti contends that he operated his business separately from the horse business, and merely leased half of the premises for use by Phillips (Tr. 202). Cf. United States v. Comer, 288 F.2d 174 (C.A. 6, 1961). The Government agents testified that they never saw Ciancutti accept a horse bet (Tr. 227).

It would seem that the method in which the structure of the business was set up could have been taken to be a complex "front" * rather than a genuine separa-

---

* Besides the purported lease of part of the second floor to Phillips, there were other deceptive practices employed. Mangini rented the basement. (Tr. 75, 82.)

A coin telephone was installed there by him and a home-made connection spliced an outside line to the equipment used in the horse office. (Tr. 293–99). Cian-

tion of Ciancutti's individual business from the horse betting business. By acquitting Ciancutti on Counts 13 and 14 the jury evidently indicated its belief that he was not active during the period of time covered by those counts (the months of April, May, and June, 1960). By acquitting him on Count 2 it would appear that the jury felt that he did not have the knowledge necessary to amount to wilfulness with respect to the tax return filed by Phillips in October, 1961. However, this is not incompatible with his being a member of a general conspiracy or proprietorship to defeat the collection of the ten percent excise tax on the huge volume of horse race business done at the establishment.

■ There is likewise no merit in the contention that there is a merger between the offenses set forth in 26 U.S.C.A. § 7262 and 26 U.S.C.A. § 7203, so that they constitute the same crime and only one sentence should be imposed for a violation of both provisions. The gist of the offense created by 26 U.S.C.A. § 7203 is wilful failure to pay tax. The conduct forbidden by 26 U.S.C.A. § 7262 is not simple failure to pay tax, but rather the performance of a taxable act without having paid the applicable tax. One count of the indictment in the Di-Primio case, supra, was quashed by this Court for failure to observe that distinction. A clear statement of this point was given by the late Chief Judge Laws in United States v. Bowman, 137 F.Supp. 385, 387 (D.C.1956), illustrating the distinction by comparison with the offense of driving an automobile without a license. See also United States v. Shaffer, 291 F.2d 689, 693 (C.A. 7, 1961).

Division of labor and specialization is possible in an illegal enterprise just as much as in a legitimate partnership or corporate enterprise. That a particular executive may not have the personal knowledge necessary to show wilful intent with respect to one particular transaction handled in another department

cutti provided the ticker service and utilities as well as a substantial door and

does not negate his participation in the overall program of the enterprise. Ciancutti's connection with the gambling establishment in the Garibaldi Building was sufficiently proved to warrant the jury in finding him a participant in the general overall conspiracy charged in Count 1.

Hence all the motions of the various defendants for new trial, judgment of acquittal, or arrest of judgment should be denied, and the defendants directed to appear in due course for sentence.

boarded-up, heavily-curtained windows. (Tr. 118, 424, 557–8, 572, 577, 584).