**D. I. OPERATING CO., a Nevada corporation, Plaintiff,**

and

**United Resort Hotels, Inc., a Delaware corporation, as successor to United Hotels Corporation, a dissolved Delaware corporation, as successor to Wilbur Clark's Desert Inn Co., a dissolved Nevada corporation, Plaintiff,**

and

**Desert Inn Operating Company, a Nevada corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. Nos. 313–315.

United States District Court
D. Nevada.

Jan. 4, 1965.

J. A. Donnelley, San Diego, Cal., for all plaintiffs.

John W. Bonner, U. S. Atty., Robert S. Linnell, Chief Asst. U. S. Atty., Las Vegas, Nev., Jerome Fink, Burton A. Schwalb, Department of Justice, Washington, D. C., for defendant.

ROGER D. FOLEY, Chief Judge.

This is an action by a taxpayer to recover excise taxes, plus interest, paid under protest. These three cases were consolidated and tried to the Court. The three corporate plaintiffs, herein called the "Desert Inn", seek to recover One Hundred Sixty-three Thousand Three Hundred Ten and 87/100 Dollars ($163,-310.87), plus interest, in wagering taxes paid under protest for the period April, 1953, through April, 1959.

The following facts are not in dispute: Beginning in 1953, and continuing to date, the Desert Inn has sponsored, with the approval of the Professional Golfers Association, an annual Tournament of Champions in Las Vegas. Each year, during the period in question, 1953–1959, a calcutta pool was conducted by the Desert Inn. On the evening prior to the beginning of the golf tournament, the name of each participating professional golfer was offered for bid by an auctioneer to a private group of persons

invited to attend a dinner and the auction in the Painted Desert Room of the Desert Inn Hotel. Ninety per cent of all sums received from successful bidders were paid into the pool and distributed after the tournament to the winners of the pool. The remaining ten per cent was contributed to the Damon Runyon Memorial Fund for cancer research. The Desert Inn retained no percentage of the sums received and made no charge for operating the pool.

The total gross receipts paid into the calcutta pool by successful bidders were as follows:

| "1953 | . | $ 93,250 |
|-------|---|----------|
| 1954 | | 137,850 |
| 1955 | | 202,500 |
| 1956 | | 129,000 |
| 1957 | | 265,650 |
| 1958 | | 266,000 |
| 1959 | | 380,000" |

The Desert Inn had guaranteed the Runyon Cancer Fund a minimum of $35,000 annually. In each year, except 1959, ten per cent of the pool was less than $35,000, and the Desert Inn, in each of those years, made up the difference out of pocket.

In all of the years involved, both the calcutta pool and the Tournament of Champions were operated at a loss and these losses were claimed and allowed as expenses by the Desert Inn on its income tax returns.

26 U.S.C. § 4401 (Internal Revenue Code of 1954) imposes an excise tax of ten per cent on wagers.

26 U.S.C. § 4421(1) (B) defines a wager as follows:

"The term 'wager' means * * * any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted *for profit.*" (Italics added)

The years 1953 and 1954 are governed by the Internal Revenue Code of 1939, and the years from and after 1955 are governed by the 1954 Code. See 26 U.S.C. § 7851(a) (4) of the 1954 Code.

In the Internal Revenue Code of 1939, Section 3285 (26 U.S.C. 1952 ed.) also imposed a ten per cent excise tax on wagers and defines the term "wager" in words identical with Section 4421 of the 1954 Code:

"The term 'wager' means * * * any wager placed in a wagering pool with respect to a sports event or contest, if such pool is conducted *for profit.*" (Italics added)

Under Section 4421, of the 1954 Code, the Treasury promulgated Regulation Section 44.4421–1 (26 CFR 44.4421–1).

Section 44.4421–1(a) (2) reads as follows:

"(a) *Wager.* The term 'wager' means—

"(2) Any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit."

Section 44.4421–1(c) (4) reads:

"(4) *Conducted for profit.* A wagering pool or lottery may be conducted for profit even though a direct profit will not inure from the operation thereof. A wagering pool or lottery operated with the expectancy of a profit in the form of increased sales, increased attendance, or other indirect benefits is conducted for profit for purposes of the wagering tax."

For the years 1953 and 1954, there was no similar Treasury regulation, but the Government urges that for those years, the language of Regulation 44.4421–1 (c) (4) constitutes a correct interpretation of the words "conducted for profit" as found in the statutes.

It has been stipulated that the calcutta pool constituted a wagering pool and the amounts paid into the pool by the successful bidders constituted wagers within the meaning of the pertinent sections of the Internal Revenue Codes of 1939 and 1954. The only issue is whether or not the tax applies and this turns on the question of whether or not the calcutta pool was conducted for profit.

The Government contends that the tax of ten per cent upon the gross amount paid into the pool by the successful bidders was lawfully collected, arguing that the Desert Inn profited both directly and indirectly from the calcutta pool.

The Desert Inn's position is that there was no direct profit since the pool always operated at a loss, but the Desert Inn concedes that in conducting the pool, it expected to benefit indirectly by increased public patronage of its hotel, restaurants, bars and casino.

The evidence establishes not only that there was no direct profit, but that there was a loss in each year of the pool's operation.

The Government's arguments that the Desert Inn received direct financial benefits are so untenable as to be unworthy of comment, save one. The Government argues that there was a direct financial benefit from the operation of the pool because the ten per cent of the gross receipts and other expenses of the operation of the pool were entered in the corporate books as business and promotional expenses and claimed as deductions for income tax purposes. This is tantamount to an admission that the pool was operated at a loss. In any event, to the extent that such a loss is a benefit income tax wise, it could only be an indirect and not a direct benefit or profit to the Desert Inn.

The Court finds, therefore, that the Desert Inn did not realize any direct benefit or profit from the pool, but actually sustained financial losses in the years 1953–1959.

On the other hand, the Court finds that although the pool was operated at a loss during the period in question, the Desert Inn did operate the pool with the expectancy of profit in the form of increased public patronage within the meaning of Regulation Section 44.4421–1(c) (4).

There is only one, but most important, question to be resolved, and that is, whether or not Regulation Section 44.-4421–1(c) (4) is valid. If valid, the Government is entitled to judgment. If invalid, the Desert Inn must prevail.

This question is one of first impression.

A wager placed in a wagering pool is taxable if the pool was conducted for profit. What was the intent of Congress? Was it intended to tax wagering pools:

(a) only when the operator retained for his own benefit some portion or percentage of the gross amount wagered? or

(b) only when the operator collected a fee from the bettor? or

(c) in some other manner, realized a direct profit from the operation of the pool?

On the other hand, is a wagering pool conducted for profit when it is a trade stimulator, where its purpose is to promote other business activities of the operator, although one hundred per cent of the sums wagered are paid out?

Obviously, the Desert Inn would not have conducted the calcutta pool had it not anticipated some indirect financial benefit. The evidence reflects that the Desert Inn management willingly took a loss on the pool, as well as on the Tournament of Champions of which it was a part, with the expectation that its other business activities, such as its hotel, restaurants, bars and casino would benefit. The pool was not operated for charity.

In 1951, Congress added to the Internal Revenue Code of 1939 Section 3285.[1]

---

1. "Internal Revenue Code of 1939:
"SEC. 3285 (as added by Sec. 471(a), Revenue Act of 1951, c. 521, 65 Stat. 452). TAX.
"(a) *Wagers.*—There shall be imposed on wagers, as defined in subsection (b), an excise tax equal to 10 per centum of the amount thereof.

"(b) *Definitions.*—For the purposes of this chapter—
"(1) The term 'wager' means (A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers, (B) any wager placed in a wagering pool with respect to a sports event or a con-

The same wagering tax was carried forward in the Revenue Act of 1954.[2]

■ The Court takes judicial notice that Congress passed the Wagering Tax Act not only to raise revenue, but also to aid law enforcement in attempting to surpress wide-spread, nation-wide, illegal gambling activities being carried on in violation of the criminal laws of the several States.

test, if such pool is conducted for profit, and (C) any wager placed in a lottery conducted for profit.

"(2) The term 'lottery' includes the numbers game, policy, and similar types of wagering. The term does not include (A) any game of a type in which usually (i) the wagers are placed, (ii) the winners are determined, and (iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game, and (B) any drawing conducted by an organization exempt from tax under section 101, if no part of the net proceeds derived from such drawing inures to the benefit of any private shareholder or individual.

"(c) *Amount of Wager.*—In determining the amount of any wager for the purposes of this subchapter, all charges incident to the placing of such wager shall be included; except that if the taxpayer establishes, in accordance with regulations prescribed by the Secretary, that an amount equal to the tax imposed by this subchapter has been collected as a separate charge from the person placing such wager, the amount so collected shall be excluded.

"(d) *Persons Liable for Tax.*—Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery.

"(26 U.S.C. 1952 ed., Sec. 3285.)"

2. "Internal Revenue Code of 1954:
  "SEC. 4401. IMPOSITION OF TAX.
  "(a) *Wagers.*—There shall be imposed on wagers, as defined in section 4421, an excise tax equal to 10 percent of the amount thereof.
  "(b) *Amount of Wager.*—In determining the amount of any wager for the purposes of this subchapter, all charges incident to the placing of such wager

Senate Report No. 781, 82nd Congress, First Session 1951–1952, U.S.Code Congressional and Administrative News 1951, pp. 2090, 2091, as quoted from in Plaintiffs' Opening Brief, is significant:

" 'The tax is limited (1) to wagers on sports events or contests placed with a person engaged in the business of accepting such wagers, (2) to wagers placed in a wagering

shall be included; except that if the taxpayer establishes, in accordance with regulations prescribed by the Secretary or his delegate, that an amount equal to the tax imposed by this subchapter has been collected as a separate charge from the person placing such wager, the amount so collected shall be excluded.

"(c) *Persons Liable for Tax.*—Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person, who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery. (26 U.S.C. 1958 ed., Sec. 4401.)

"SEC. 4421. DEFINITIONS.
  "For purposes of this chapter—
  "(1) *Wager.*—The term 'wager' means—
  "(A) any wager with respect to a sports event or a contest placed with a person engaged in the business of accepting such wagers,
  "(B) any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit, and
  "(C) any wager placed in a lottery conducted for profit.
  "(2) *Lottery.*—The term 'lottery' includes the numbers game, policy, and similar types of wagering. The term does not include—
  "(A) any game of a type in which usually
  "(i) the wagers are placed,
  "(ii) the winners are determined, and
  "(iii) the distribution of prizes or other property is made, in the presence of all persons placing wagers in such game, and
  "(B) any drawing conducted by an organization exempt from tax under sections 501 and 521, if no part of the net proceeds derived from such drawing inures to the benefit of any private shareholder or individual.
  "(26 U.S.C. 1958 ed., Sec. 4421.)"

pool which involves a sports event or contest, if the pool is conducted for profit, and (3) to wagers placed in a lottery conducted for profit. It is believed that wagering transactions of these types make up by far the largest proportion of the total gambling business ' "

and

" ' * * * The requirement that the pool be operated for profit is designed to eliminate from the tax base those pools which are occasionally organized among friends or other associates, all of the contributions being distributed to the winner or winners.' "

It was the intent of Congress to attempt to solve a national social problem, as well as to raise revenue. It was against profits earned from the business of conducting sport books, lotteries, numbers and policy games, as well as wagering pools that Congress took aim.

■■ A careful reading of the Wagering Tax Act leads this Court to the conclusion that Congress never intended to tax wagering pools conducted at a loss as trade stimulators. There is no statutory authority subjecting the Desert Inn's calcutta pools conducted from 1953–1959 to the Wagering Tax Act. To do so, one would have to read into the law something that is not there. As the Supreme Court said in United States v. Calamaro, 354 U.S. 351, at pages 358 and 359, 77 S.Ct. 1138, at page 1143, 1 L.Ed. 2d 1394:

"In light of the above discussion, we cannot but regard this Treasury Regulation as no more than an *attempted addition to the statute of something which is not there.* (Italics added). As such the regulation can furnish no sustenance to the statute."

■ The Court finds no ambiguity in the statutory language "conducted for profit". There being no ambiguity, there is nothing to construe.

In Fisher Flouring Mills Co. v. United States, 9 Cir. 1959, 270 F.2d 27, at page 30, we find the following language:

" * * ·* it seems clear that the Supreme Court has not abandoned the axiom that the legislative will must be ascertained from the text of the statute if the words are clear and plain and the whole enactment internally cohesive. * * * In virtue of legislative selectivity of objects of taxation, an act levying imposts should not be construed if unambiguous even by the use of adventitious aids ordinarily available."

To hold the Regulation (44.4421–1(c) (4)) valid would require this Court to read the words of the statute in a strained and unnatural sense.

" 'The popular or received import of words furnishes the general rule for the interpretation of public laws.' " Woolford Realty Co. v. Rose, 286 U.S. 319, 327, 52 S.Ct. 568, 570, 76 L.Ed. 1128.

The Court finds the case of Deshler Hotel Co. v. Busey, D.C., 36 F.Supp. 392, very persuasive. At Page 396, the Court stated:

"The third requirement of the statute is that such public performances must have been for 'profit'. The same word is used in the regulation without any attempt to define it. The court is both entitled and required to give it the usual and accepted meaning. Since it has been found that no admission charge in any form was made, it follows as a matter of logic, that the performances could not have been given for a direct profit. Rather it would appear that the entertainment was furnished at the expense of the hotel as an ordinary accompaniment of the service of food and refreshment in the manner customary to hotels of the class to which the plaintiff belongs; something expected by the customer and essential to good and profitable business relations, but in itself yielding no profit. In this

case, the expense of the entertainment was an overhead expense incidental to the class of business in which the plaintiff was engaged. This court is therefore of the opinion and holds as a finding of fact, that such performances were not for profit in any accepted sense of the word, but that the expense involved was borne by the plaintiff as overhead. In general, it may be said that no commercial firm undertakes expenditures in the form of overhead without expecting a profit from the business in which the expenditures are made, but it is not from these overhead items that profit is derived. The profit is derived from the business itself and it is partially consumed by the overhead expenses; hence, such items are, in themselves, items of expense and not of profit."

On appeal, Busey v. Deshler Hotel Co., 6 Cir., 130 F.2d 187, 142 A.L.R. 563, the Sixth Circuit, in affirming, said, in part, at page 190:

"To become binding, interpretative regulations must be reasonable and in furtherance of the intention of Congress, as evidenced by its Acts. An arbitrary regulation of the Commissioner of Internal Revenue is not enforceable. Where the language of a taxing statute is plain and unambiguous, there is no occasion for resort to interpretative promulgations of the Treasury Department. Neither the administrative officers nor the courts may supply omissions or enlarge the scope of the statute. See Iselin v. United States, 270 U.S. 245, 250, 251, 46 S.Ct. 248, 70 L.Ed. 566."

The Court is not unmindful of the rule set forth in Commissioner v. South Texas Lumber Co., 333 U.S. 496, at page 501, 68 S.Ct. 695, at page 698, 92 L.Ed. 831:

"This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with

the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. See, e. g., Fawcus Machine Co. v. United States, 282 U.S. 375, 378 [51 S.Ct. 144, 75 L.Ed. 397]."

■ The Regulation (44.4421–1(c) (4)) is unreasonable and plainly inconsistent with the controlling statute. The Government, at Pages 10 and 11 of its Brief, states, in part:

" 'In speaking of the provisions which are in issue here, the relevant Committee Reports stated (H.Rep. No. 586, 82d Cong., 1st Sess., p. 56 (1951–2 Cum.Bull. 357, 398); S. Rep. No. 781, 82d Cong., 1st Sess., p. 114 (1951–2 Cum.Bull. 458, 540)):

'The requirement that the pool be operated for profit is designed to eliminate from the tax base those pools which are occasionally organized among friends or other associates, all the contributions being distributed to the winner or winners. A pool would be considered as being operated for profit, if, for example, a person appropriated to himself a percentage of the amount contributed to the pool or required a fee for the privilege of contributing to the pool.'

" 'While the example given is of a pool where the operator retains a share, the import of the entire quotation is that only the social or friendly type of pool, occasionally organized among friends or associates, is to be excluded from the tax.' "

■ The Court judicially notices that it is customary, today, in many taverns and beer parlors, to conduct wagering pools of televised sporting events. All of the sums wagered are paid to the winner or winners. The house does not charge the bettor or participate in any way in the winnings. This practice in-

creases the interest of patrons in such sporting events, stimulating trade. If the Regulation (44.4421–1(c) (4)) is valid, the Government would tax the gross sums wagered in such cases because of the expectancy of indirect benefits or profits from increased public patronage. This is not done.

The Findings of Fact, Conclusions of Law and Judgment shall be prepared and submitted to the Court in accordance with local Rule 15.