UNITED STATES of America,
Appellant,

v.

D. I. OPERATING CO., Appellee.

UNITED STATES of America,
Appellant,

v.

UNITED RESORT HOTELS, INC.,
Appellee.

UNITED STATES of America,
Appellant,

v.

DESERT INN OPERATING COMPANY,
Appellee.

Nos. 20293–20295.

United States Court of Appeals
Ninth Circuit.

June 9, 1966.

Rehearing Denied Aug. 5, 1966.

———◆———

John W. Bonner, U. S. Atty., Las Vegas, Nev., Richard M. Roberts, Acting Asst. Atty. Gen., Meyer Rothwacks, Jerome Fink, Attys., Dept. of Justice, Washington, D. C., for appellant.

William Singleton, Las Vegas, Nev., J. A. Donnelley, San Diego, Cal., for appellee.

Before MADDEN, Judge of the Court of Claims, and HAMLEY, and MERRILL, Circuit Judges.

MADDEN, Judge.

Section 4401 of the Internal Revenue Code of 1954 imposes an excise tax of ten per cent on wagers. Section 4421(1) (B) of the code defines a wager as:

(1) Wager.—The term "wager" means —* * *

(B) any wager placed in a wagering pool with respect to a sports event or a contest, if such pool is conducted for profit.

Under section 4421 the Treasury has promulgated Treasury Regulation section 44:4421(c) (4) construing the statutory language "conducted for profit":

(4) *Conducted for profit.* A wagering pool or lottery may be conducted for profit even though a direct profit will not inure from the operation thereof. A wagering pool or lottery operated with the expectancy of a profit in the form of increased sales, increased attendance, or other indirect benefits is conducted for profit for purposes of the wagering tax.

■ The question presented here is whether this Treasury Regulation is valid insofar as it interprets the word "profit" in section 4421(1) (B) of the code to include indirect as well as direct profit. The district court found that section 4421(1) (B) clearly and unambiguously referred only to direct profits of a wagering pool and held the Treasury Regulation to be invalid.[1] We reverse.

This case arises from the following undisputed facts as reported in the opinion of the district court. The three corporate defendants (herein referred to as the "Desert Inn" or the "Inn") seek to recover wagering taxes paid under protest for the period April, 1953, through April, 1959.[2] Beginning in 1953, and continuing through the years in question, the Desert Inn sponsored an annual golf "Tournament of Champions" in Las Vegas, Nevada. Each year during the period in question a "calcutta" wagering pool was conducted by the Inn in conjunction with the tournament. On the

---

1. D. I. Operating Co. v. United States, 239 F.Supp. 78 (D.C.Nev.1965).

2. The years 1953 and 1954 are governed in this case by the Internal Revenue Code of 1939, and the later years in question are governed by the 1954 code. See § 7851(a) (4) of the 1954 code. Section 3285 of the 1939 code, added by ch. 521, § 471(a), 65 Stat. 529 (1951), also imposed the ten per cent excise tax on wagers and defined "wager" in words identical to the language of § 4421(1) (B) of the 1954 code. No treasury regulation corresponding to § 44.4421–1(c) (4) was promulgated under the 1939 code. If that regulation, however, correctly construes the term "conducted for profit" in § 4421(1) (B) of the 1954 code, it would also be a proper construction of the identical language in the 1939 code.

evening prior to the beginning of the tournament the name of each participating professional golfer was offered for bid by an auctioneer to a private group of persons invited to dinner and the auction by the Desert Inn. Ninety per cent of the sums received from bidders went into the wagering pool and was distributed after the tournament to winners of the pool. The remaining ten per cent was contributed to the Damon Runyon Memorial Cancer Fund for cancer research.

The Desert Inn guaranteed the Cancer Fund a minimum of $35,000 in exchange for the right to use the Fund's name in connection with the tournament and the wagering pool.[3] In each year except 1959 ten per cent of the pool fell short of the $35,000, and the Desert Inn made up the shortfall out of pocket. In all the years involved both the pool and the golf tournament were operated at a loss, and these losses were claimed and allowed as business expenses of the Desert Inn for income tax purposes. The Inn made no charge for operating the pool.

The district court found that, although the wagering pool was operated at a loss during the period in question, the Desert Inn did conduct the pool with the expectation of indirect profit in the form of increases in public patronage within the meaning of the challenged regulation section 44.4421–1(c) (4). It is not in dispute that the management of the Inn willingly accepted losses on the pool as well as on the tournament itself in the

expectation of increased profits from the Inn's hotel, restaurants, bars and gambling operations. As the district court said, "The pool was not operated for charity." D. I. Operating Co. v. United States, 239 F.Supp. 78, 81 (D.C.Nev. 1965).

It was stipulated that the calcutta pool constituted a wagering pool and that the amounts paid into the pool constituted wagers. The only question here, therefore, is whether the tax applies, and this turns on the validity of the regulation in question—whether a pool conducted for the kinds of indirect benefits contemplated by the Desert Inn is a pool "conducted for profit" within the meaning of the relevant sections of the 1939 and 1954 codes.[4]

Two separate lines of authority are urged upon us by the parties in support of their respective positions. Appellee and the district court found support for a narrow application of the phrase "conducted for profit" in cases construing the phrase "public performance for profit" in the pre-1942 version of the so-called cabaret tax statute. Prior to 1942 section 500(a) (5) of the Revenue Act of 1926, ch. 27, 44 Stat. 9, imposed a tax on amounts "paid for admission to any public performance for profit at any roof garden, cabaret, or other similar entertainment, to which the charge for admission is wholly or in part included in the price paid for refreshment, service, or merchandise."[5] Two district court opinions

---

3. The district court made no finding whether the $35,000 payment was made to have the Fund sponsor the calcutta or the entire tournament, including the calcutta; but there is evidence in the record showing that the entire tournament was advertised as under the sponsorship of the Fund. We do not, however, consider resolution of this question relevant to our decision here.

4. The government also argues that the tax applies in this case because the Desert Inn received a direct financial benefit from the pool. The government takes the position that the Inn's retention of ten per cent of the calcutta fund in partial reimbursement for the $35,000 guarantee,

which was paid by the Inn in advance to the Cancer Fund, was, in effect, retention of a portion of the pool to defray a business expense. However, only to the extent that the retained ten per cent fell short of $35,000 did the Inn incur a business expense with regard to the guarantee. The district court's finding that the Desert Inn realized no direct profit from the pool is correct.

5. The cabaret tax as amended by the Revenue Act of 1942 to eliminate the requirement of an admission charge for imposition of the tax. As thus amended, the tax remains, substantially unchanged, as §§ 4231, 4232 of the 1954 code. See § 4232 (c).

construing the section indicated, without specifically holding, that only where profit was directly realized from the performance in question did the statute apply.[6]

On the other hand, the government relies upon cases construing the identical words "performance for profit" in the Copyright Act, 17 U.S.C. § 1(e) (1958), where the phrase has been broadly interpreted to include indirect profit. In the recent case of Chappell & Co. v. Middletown Farmers Market & Auction Co., 334 F.2d 303 (3rd Cir. 1964), the appellee, a shopping center, piped recorded, copyrighted music throughout the center during shopping hours. The court held that such was a "performance for profit" to the extent "that it was commercially beneficial," without regard to whether the pecuniary benefit was direct or indirect. Ibid. at 306.

We find neither the cabaret tax cases nor the copyright cases compelling here. The pre-1942 cabaret tax statute and the litigation involving it were concerned primarily with the requirement that the performance in question be attended by some admission fee or increased charges to patrons. As long as this requirement was in the statute, it was impossible for the tax to apply where there was no direct profit involved.

In the copyright cases, on the other hand, the courts have been concerned with protecting the monopoly rights created under the Copyright Act.[7] No similar concern for the protection of a specific statutory right guides the construction of the wagering tax law.

 While neither of these lines of authority is controlling here, they do suggest, contrary to the holding of the district court, that the statute before us is not clear and unambiguous. There is nothing in the word "profit" as it appears in section 4421(1) (B) which indicates that the gain referred to must be derived from the wagering pool itself, and the potential reach of the phrase "conducted for profit" would appear at least as wide as that of "performance for profit." In such circumstances it is well settled that treasury regulations are to be accorded great weight and not overruled unless shown to be plainly inconsistent with the statute. Koshland v. Helvering, 298 U.S. 441, 446, 56 S.Ct. 767, 80 L.Ed. 1268 (1936).

█ The regulation in question takes the position that a wagering pool conducted for a commercial purpose is a pool "conducted for profit." A study of the legislative history of the statute indicates that the specific question involved here was not adverted to when the wagering tax was added to the Internal Revenue Code by the Revenue Act of 1951. That history does indicate, however, that the position taken by the regulation is consistent with the broad purpose of the tax. The committee reports accompanying the statute reveal that it was intended to make "commercialized gambling" help meet "the present need for increased revenue, especially at a time when many consumer items of a semi-necessity nature are being called upon to bear new or additional tax burdens." H.Rep. No. 586, 82d Cong., 1st Sess., p. 55 (1951–2 Cum. Bull. 357, 397); S.Rep. No. 781, 82d Cong., 1st Sess., p. 113 (1951–2 Cum.Bull. 458, 539.) Whatever ancillary regulatory effect the wagering tax might have, it was intended as a revenue measure. United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953).

6. United States v. Broadmoor Hotel Co., 30 F.2d 440 (D.C.Colo.1929); Deshler Hotel Co. v. Busey, 36 F.Supp. 392 (S.D. Ohio 1941). The latter case was affirmed upon appeal on the single ground that there was no increased charge for food or service in connection with the performance involved. Broadmoor Hotel was cited with approval. Busey v. Deshler Hotel Co., 130 F.2d 187, 142 A.L.R. 563 (6th Cir. 1942).

7. The Supreme Court long ago concluded that "if the rights under the copyright are infringed only by a performance where money is taken at the door, they are very imperfectly perfected." Herbert et al. v. Shanley Co. et al., 242 U.S. 591, 594, 37 S.Ct. 232, 233, 61 L.Ed. 511 (1917).

The phrase "conducted for profit" is not so clear and unambiguous as to be closed to construction, and the revenue purposes of the statute are best served by construing it broadly. The regulation in question is not inconsistent with the terms of the statute and is consistent with the congressional intent that commercialized gambling contribute an increased share to the national revenues. We find it to be a valid interpretation of § 4421(1) (B).

There is no question that the regulation was properly applied in this case. The committee reports accompanying the statute state that the tax was not meant to apply to the purely "social" or "friendly" type of betting pool sometimes organized among friends or other associates. H.Rep. No. 586, supra at 55–56; S.Rep. No. 781, supra, at 113–114. While the Desert Inn's calcutta was an invitation-only affair, it was hardly the kind of "social" or "friendly" pool whose exclusion from the tax was contemplated by Congress.

The decision of the district court is reversed.