Thomas F. DALEY, Defendant, Appellant,

v.

UNITED STATES of America, Appellee.

Arthur F. DUNNETT, Jr.,

v.

UNITED STATES of America, Appellee.

Louis FRONGELLO, Alias

v.

UNITED STATES of America, Appellee.

James J. PALMISANO

v.

UNITED STATES of America, Appellee.

Edward LAVALLE

v.

UNITED STATES of America, Appellee.

Angelo ROSSETTI

v.

UNITED STATES of America, Appellee.

Francis J. JUDD

v.

UNITED STATES of America, Appellee.

Nos. 4973–4979.

United States Court of Appeals First Circuit.

March 30, 1956.

Writ of Certiorari Denied June 4, 1956.

See 76 S.Ct. 1028.

124

Alfred Sigel and Edward F. McLaughlin, Jr., Boston, Mass., for appellants.

David E. Place, Sp. Asst. to U. S. Atty., Boston, Mass., with whom Anthony Julian, U. S. Atty., Washington, D. C., was on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

A separate information was filed in the court below against each of the seven appellants herein. The informations, which were identical except for the names of the respective defendants, were each in two counts. Count 1 charged that the accused, on or about May 29, 1953, at Revere, in the District of Massachusetts, "did engage in the business of accepting wagers and of conducting a lottery and of conducting a wagering pool, as defined in 26 U.S.C. 3285, and did wilfully fail prior to the commencement of said business engagements to pay the special occupational tax as required by 26 U.S.C. 3290, * * * in violation of 26 U.S.C. 3294 and 2707(b)." Count 2 charged that the accused, on or about May 29, 1953, at Revere, Mass., "did engage in the business of accepting wagers and of conducting a lottery and of conducting a wagering pool, as defined in 26 U.S.C. 3285, and did wilfully fail prior to the commencement of said business engagements to register as required by 26 U.S.C. 3291, in violation of 26 U.S.C. 3294 and 2707(b)."

Upon motion of the government, allowed by the district court, the seven informations were consolidated for trial. After a lengthy trial the jury reported verdicts of guilty on all counts, and these appeals were taken from the ensuing judgments of conviction.

The district judge repeatedly explained to the jury that the act of Congress in question did not denounce gambling as such, or the participation in a gambling business, as a federal offense; that if the evidence might indicate some

gambling offenses against state law, this was wholly irrelevant to the offenses for which the defendants were being tried; that the federal offense was participating in a gambling "business," without having previously paid the special occupational tax or without having previously registered as required by federal law.

The defendants were not charged with a conspiracy to commit an offense against the United States, but each was charged with technically separate but similar offenses of participating in a gambling "business" without having individually paid the required occupational tax to the United States or without having individually registered with the appropriate federal collector of internal revenue.

The government proved by uncontradicted evidence that no one of the seven defendants had paid the special occupational tax for the year in question, and that no one of the defendants had complied with the registration requirements of 26 U.S.C. § 3291. Therefore, the only other element of the separate offenses which the government had to establish beyond a reasonable doubt was that each of the defendants had engaged in the described gambling "business." In this respect the government sought to show that all seven of the defendants had participated together, on or about May 29, 1953, in the conduct of a single gambling enterprise or "business" at 560 Winthrop Ave., Revere, Mass.—that was the common element of the offenses charged against all seven of the defendants.

Accordingly the United States moved for consolidation of the seven informations for the purpose of trial, under Rule 13 of the Federal Rules of Criminal Procedure, 18 U.S.C., on the ground "that all of the defendants in the above-entitled actions are alleged, in informations filed in this Honorable Court, to have participated in the same act or transaction, or series of acts or transactions, constituting the same offenses * * *." Appellants contend that the allowance of this motion by the district court was reversible error. We do not agree.

Rule 13 provides that the district court "may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information." This requires a reference back to Rule 8(b), which provides that two or more defendants "may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count."

Considering the participation by the defendants in the same gambling business as "the same act or transaction", is it the same act or transaction "constituting an offense or offenses", within the meaning of Rule 8(b)? In a hypercritical reading of the rule, it may be suggested that proof of a particular defendant's participation in such act or transaction does not of itself establish the offense charged, for this particular defendant might, or might not, have paid the occupational tax, or complied with the registration requirements. But Rules 13 and 8(b) are not to be read so narrowly. See Cataneo v. United States, 4 Cir., 1948, 167 F.2d 820; Jordan v. United States, 5 Cir., 1941, 120 F.2d 65. The rules are designed to promote economy and efficiency and to avoid a multiplicity of trials, where these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial. Rule 8(b) on its face contemplates the situation where some of the evidence might be admissible against one defendant and not against a codefendant at a single trial, for in its concluding clause the rule provides that "all of the defendants need not be charged in each count."

Here, participation by the seven defendants in the gambling business at 560 Winthrop Avenue constituted the concluding element of the two offenses of which they were all charged, since it was undisputed that none of them had paid the occupational tax or registered. We have no doubt that the district court was empowered under the rules to entertain the motion by the United States for trial of the seven informations together. So far as the record discloses, none of the defendants made any move for the relief afforded under Rule 14, which provides that if it appears "that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information *or by such joinder for trial together,* the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." [Italics added.] In the circumstances before us, we cannot say that the district court committed an abuse of discretion in allowing the government's motion under Rule 13. It would have been absurd here to put upon the government the expense and burden of seven separate trials, especially since most of the government's evidence related to the activities at 560 Winthrop Avenue.

The government's case was largely the outcome of persistent efforts by Sergeant Cosgrove of the Cambridge police in discharge of his duty to detect offenses against the criminal laws of the Commonwealth of Massachusetts. For some months prior to the raid by the local police at 560 Winthrop Avenue, Revere, on May 29, 1953, which will be referred to hereinafter, Cosgrove had been engaged in trailing Arthur F. Dunnett, Jr. ("Sonny"), Edward Lavalle ("Eddie"), and James J. Palmisano, all defendants herein, first in Cambridge and later to points outside of Cambridge. These three suspects were seen together in a garage at 90 Broadway, Cambridge, which contained the typical paraphernalia of a gambling establishment. Later these defendants were traced to a location on Ocean Avenue, Revere. Finally the surveillance by the Cambridge police was shifted to the vicinity of 560 Winthrop Avenue, Revere, a location across the street from the Suffolk Downs race track. There, in addition to Dunnett, Lavalle, and Palmisano, the witnesses observed the presence from time to time, prior to May 29, 1953, of Thomas Daley ("Tom"), once in the company of Angelo Rossetti ("Monge"), they being also two of the defendants in this case.

It was in evidence from the testimony of the witness Horkun that in February, 1953, Rossetti rented from Horkun a small cellar room at 560 Winthrop Avenue, ostensibly for use as a "club." Rossetti paid the first rent; the rent for April and May was paid to Horkun by Dunnett. Two telephones maintained by Horkun in his garage at the location were tapped and the wires run into the cellar room. Also, several other telephones in the neighborhood were similarly tapped, so that the occupants of the cellar room had a total of six or seven telephone lines available for calls in and out. There is not the slightest doubt of this on the evidence.

In the early afternoon of May 29, 1953, Sergeant Cosgrove, accompanied by Detective McNeil of the Cambridge police, visited the Boston office of the District Attorney for Suffolk County. The District Attorney put in a call to the Revere police. As a result of this visit Sergeant Cosgrove and Detective McNeil proceeded to the office of the chief of the Revere police, where certain Revere policemen were assigned to the raiding party, which then set out for 560 Winthrop Avenue. During a brief preliminary surveillance defendant Judd was observed to enter the premises with a cardboard box, later identified as a box containing sandwiches.

The raiding party burst into the cellar room shortly after 4:30 p. m. on May 29. Found in the room at the time were these seven defendants (and no one else), most of them sitting around a

table littered with Armstrong racing sheets, tally sheets, wagering slips, numbers pool charts, adding machines and rolls, pads and pencils, radios, etc. Several of the telephones were ringing. According to the testimony, defendant Daley, answering one of these phones, said, "Out of business, don't you understand." Defendant Dunnett, answering another phone, said, "There will be no more bets on the speed of a beast." Defendants Palmisano and Judd were also seen answering telephones when the officers arrived. Defendant Rossetti said over another phone, "No business, cops are here." George Hurley of the Revere police, one of the raiding party, testified that he picked up a ringing phone several times and received requests to put bets on horses at various tracks.

The raiding officers gathered up and carted off to the Revere police station the paraphernalia found in the room. This was later used in some state court forfeiture proceeding, after which it was turned over to the federal authorities for inspection and possible use in federal prosecutions, and at the trial below the various items seized in the raid were introduced into evidence as exhibits. Prosecution witnesses, who testified to what they had seen in the room and seized, identified specifically some of the larger objects as having been among the property taken away. As to the great number of tally sheets, wagering slips, and other papers seized, the witnesses said on direct or cross-examination that they could not swear that the papers offered as exhibits were the identical ones seized in the raid, but that the various items were similar in size, appearance and kind to what had been taken. The government traced out the custody of the seized property from the time it was taken in the raid to the time it was offered in evidence, and the jury would have been warranted in finding that the papers in the exhibits were found in the cellar room. On various of the numbers pool sheets or wagering slips, the names "Monge,"

"Sonny," "Lou," "Tom," and "Eddie" appeared. These were nicknames of the defendants Rossetti, Dunnett, Frongello, Daley, and Lavalle. The witness De-Luca, a special agent of the Intelligence Division of the Bureau of Internal Revenue, who examined the seized material, and who was duly qualified as an expert, testified that in his opinion the various papers seized were typical paraphernalia to be found in the headquarters office of a large-scale gambling business engaged in accepting bets on horse and dog races and numbers pools. The evidence indicated that 560 Winthrop Avenue was not a location where customers came to place bets or to collect winnings, but was a telephone center or central office of the gambling enterprise. In all the weeks of surveillance to which the officers testified, there was no testimony that anyone was seen coming to or out of the premises other than the defendants herein.

■ Testimony as to the hiring of the premises by Rossetti and the payment of two months' rent by Dunnett, the installation of the various tapped telephones, the statements made by various of the defendants who answered ringing telephones at the time of the raid, all this was admitted in evidence over objection, and the judge told the jury that such evidence could be applied as against each and every defendant whom they determined to have been a participant in a common gambling enterprise. Appellants insist that this ruling was in error, in the absence of a charge of conspiracy. We do not think that this is so. In United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, certiorari denied, 1944, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047, Olweiss, Schwarz and Nass appealed from a conviction for concealing a bankrupt's goods from his trustee. In an opinion by Learned Hand, C. J., the court said, 138 F.2d at pages 799–800:

"Schwarz and Nass complain that although they were not indicted for conspiracy, they were convicted as

accomplices of Olweiss, and upon evidence admissible only against him. It was proper to charge them as principals—which they probably were in any event—even though they were only accessories. (§ 550, Title 18, U.S.C.A.); and any evidence admissible against Olweiss was admissible against them, so far as it consisted of conduct in furtherance of the joint venture in which all three were engaged. The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal."

More broadly, the defendants seem to have asserted that the exhibits seized in the raid, and the testimony of the officers with reference thereto, should not have been admitted into evidence for any purpose, for they moved "that all the documentary evidence consisting of papers, racing sheets (Armstrongs), race track programs, and all articles taken from the room located at 560 Winthrop Avenue, Revere, Massachusetts, and all oral evidence relating to the same be stricken from the record." This motion the court quite correctly denied. The government of course had to prove that a gambling "business" as defined in the statute was being conducted at 560 Winthrop Avenue. This was a necessary element in the required proof as against each of the seven defendants, and there is no doubt that such element was established by overwhelming proof. In addition, in order to warrant a conviction of each of the defendants of the offenses charged, the government had to satisfy the jury that each defendant, individually, was engaged in such business. The judge charged, as requested by the defense, that the "mere fact that an individual was found in a place where papers and other objects, allegedly used in accepting wagers, were also found, is not sufficient of itself to convict the defendant of the offense set forth in the Information." On the other hand, the court charged, as requested by the government, and without objection by the defense so far as appears, that to be "engaged in the business of conducting a wagering pool or a lottery, a person does not have to personally receive money or a number pool or lottery bet from a bettor; if he is an active participant knowingly in an essential part of the management structure in the processing of such wagering pool or lottery bets in an existing wagering or lottery business, whether top manager, agent solicitor on the street, or an employee or associate of a communications center or central bookkeeping agency of an organization which was engaged in accepting wagers, or conducting a wagering pool or a lottery, he is engaged in such business."

In other words, as the case was presented to the jury, the evidence pointing to the existence of a gambling "business" on the premises was in effect of no application to any individual defendant, unless the jury should determine that such defendant, individually, was engaged in the business, as defined. The defendants were entitled to no more than that.

The evidence, which we have not bothered to recite in full detail, was sufficient to warrant a finding, as to each defendant, individually, that he was engaged in the described activities.

Perhaps the point most insistently urged on these appeals is that "forensic misconduct" of the judge throughout the trial resulted in a denial of due process and an unfair trial to the appellants. To assess confidently the validity of this sort of attack upon the trial judge, it is necessary to read the voluminous transcript from cover to cover. This we have done, and our examination of the record has satisfied us that appellants' criticisms of the fairness of the trial judge are entirely unwarranted.

The judge had a lot to say throughout the trial; and no doubt much of his comments and questioning of witnesses was superfluous. But this, in itself, does not constitute reversible error, however much it may have resulted in undue padding of the transcript. There were many exchanges between the court and defense counsel in which the badinage back and forth was obviously friendly and good-natured. But we find nothing to indicate that the purpose or effect of the numerous interventions by the trial judge was other than to assure that the cases be fairly presented and determined by the jury, shorn of extraneous issues.

In fact, no evidence was put in on behalf of the defendants. At the conclusion of the case for the prosecution the defense rested. Counsel for the defendants concentrated on objections to the introduction of evidence and on attempts to discredit government witnesses in cross-examination.

Much is made of alleged misconduct of the judge during the direct and cross-examination of the government witness Rubin, who was one of the neighbors whose telephones were tapped. Rubin was evidently a reluctant witness, and the judge's incredulity was aroused by Rubin's bland protestations of ignorance of what was going on. The judge questioned him vigorously as to why he had not notified the telephone company or the police when he found that his wires were being tapped. To his answer that he was "afraid" the judge asked whether he meant "physical fear." Rubin replied, clearly enough, that he meant only "mental fear"—fear of being evicted by his landlord on account of being "involved" in a dubious transaction. The prosecutor having asked Rubin on direct examination whether he had been put under any undue "pressure" as a result of his pre-trial visit to the office of the United States Attorney, defense counsel picked this point up on cross-examination and sought to make something of it. But before Rubin stepped down from the witness chair, due to the combined efforts of the prosecutor and the judge Rubin made it clear that the United States Attorney had been "very nice" to him, had not threatened him, had sought to explain to him his rights under the Fifth Amendment, and finally had suggested to him that he had better go and discuss his affairs with his own lawyer. Read in its entire context, the testimony of Rubin, which in fact was of little or no importance to the prosecution, discloses no impropriety on the part of the trial judge.

In an effort on cross-examination to discredit the testimony of Sergeant Cosgrove, defense counsel sought to imply that Cosgrove was guilty of something reprehensible in extending his police activities outside the limits of the city of Cambridge. There was also a transparent effort to stir up discord between the Cambridge police and members of the Revere police force who took part in the raid and were to appear subsequently as government witnesses, by questions designed to elicit from Cosgrove the admission that he had extended his surveillance to Revere without notifying the Revere police, and had gone to the District Attorney for Suffolk County, because of a lack of trust on his part of the Revere police.

Defense counsel also made a great pother about what was at most an inconsequential variance in detail between the testimony of Sergeant Cosgrove and of government witness Galvin of the Revere police. Cosgrove had testified that when the raiding party burst into the room he had observed the defendant Lavalle sitting at the end of the table with "an Italian roll of some kind with a piece of cheese and some other stuff in it in his right hand, leaning over the table, and in his left hand he had the receiver of a telephone." He also testified that there "was some food on the center of the table." Subsequently Officer Galvin testified to what he had observed in the raid. In the course of his cross-examination he said that he observed Mr. Lavalle eating "veal cut-

lets." In answer to a question by defense counsel, Galvin stated that he had informed the prosecutor at an interview prior to the trial that the defendant Lavalle was eating veal cutlets. Defense counsel told the court that he was "impeaching the United States Attorney for suppressing that evidence." The trial judge reacted sharply to this suggestion of reprehensible conduct on the part of the prosecutor.

■ In the foregoing, and other instances that could be mentioned, there is no doubt that the intervening comments and questions by the judge took off some of the bloom from these various trial maneuvers. But defendants in a criminal case do not have a right to insist that the judge must sit on the bench, mute and inert, while defense counsel possibly confuse the jury by injecting spurious issues of the "red-herring" variety.

■ Several times throughout the trial, the patience of the judge was sorely tried by repeated refusals of the counsel for the defense to accept his rulings of law. Nevertheless he many times cautioned the jury that they should not hold it against the defendants if tempers had occasionally flared up during the long trial, that defense counsel were distinguished lawyers and men of integrity and that when the judge found it necessary to make a ruling against them, the jury should not take this to the prejudice of the defendants or allow themselves to be deflected from their duty to keep an open mind until all the evidence was in and then to make their determination solely on the basis of the evidence submitted, under the guidance of the instructions of law to be given by the court.

Numerous other minor points are urged by appellants, but they are not deserving of specific comment. The defendants were convicted after a fair trial, and we have found no ground for reversal.

The judgments of the District Court are affirmed.