**UNITED STATES of America,
Appellee,**

v.

**Arthur McCARTHY et al., Appellants.**

**Nos. 876, 894, Dockets 72–1369, 72–1451.**

United States Court of Appeals,
Second Circuit.

Argued Aug. 15, 1972.

Decided Dec. 8, 1972.

Raymond B. Grunewald, Brooklyn, N. Y. (Michael J. Gillen and Grunewald, Turk & Gillen, Brooklyn, N. Y., on the brief), for appellants McCarthy and Komplita.

Jerome Lewis, New York City (Thomas R. Newman and Benjamin H. Siff, New York City, on the brief), for appellant DeLorenzo.

David G. Trager, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., and Peter R. Schlam, Asst. U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before MANSFIELD and TIMBERS, Circuit Judges, and GURFEIN,* District Judge.

TIMBERS, Circuit Judge:

Appellants Arthur McCarthy, Salvatore DeLorenzo and John Komplita appeal from judgments of conviction entered upon jury verdicts returned January 19, 1972 after an eleven day trial before George Rosling, District Judge, in the Eastern District of New York, finding McCarthy guilty on one count of hijacking a truck containing tin ingots moving in interstate commerce and finding McCarthy, DeLorenzo and Komplita each guilty on one count of possession of the ingots knowing they had been stolen, in violation of 18 U.S.C. § 659 (1970).[1]

On appeal, appellants claim, either separately or together, that evidence was improperly admitted to show that De-

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. The indictment, returned March 18, 1971, also charged defendants Paul White and Almando Pando, as well as the three appellants, with possession of the stolen ingots. Prior to trial, White's case was severed and he testified as a government witness. Pando was convicted on the possession count, but has not appealed.

The indictment also charged the three appellants, as well as White and Pando, with conspiracy. The conspiracy count was dismissed as to all defendants at the close of the government's case.

On March 24, 1972, McCarthy, DeLorenzo and Komplita were sentenced to terms of imprisonment of eight years, seven years and two years, respectively. All have been enlarged on bail pending appeal.

Lorenzo participated in the hijacking of the truck although he was charged only with possession of the stolen ingots contained in the truck; that the prosecutor's comment in summation about McCarthy's failure to show a tatoo on his forearm to the jury violated his Fifth Amendment privilege against self-incrimination; that the prosecutor's summation in other respects exceeded the bounds of fair comment; that there was no probable cause for the arrest of Komplita; that the trial judge improperly charged the jury on the elements of constructive possession; and that the trial judge unduly interfered with the trial of the case.

We affirm.

## I.

■ The events leading to the indictment occurred during a six day period in February 1971. The essential facts, viewed in the light most favorable to the government, as they must be at this stage of the case, United States v. D'Avanzo, 443 F.2d 1224, 1225 (2 Cir.), cert. denied, 404 U.S. 850 (1971), may be briefly summarized.

On the morning of February 19, the three appellants had a conversation with Paul White, Almando Pando and others at a store in Brooklyn. As soon as the appellants left, Pando asked White if he wanted to earn some money by driving a tractor-trailer truck from 39th Street and 3rd Avenue in Brooklyn to Manhattan. White agreed to do so. He was driven to the location of the tractor-trailer.

Also on the morning of February 19, approximately 440 tin ingots valued at $70,000, which had just arrived from Malaysia by ship at the Brooklyn waterfront, were loaded there onto a tractor-trailer which was driven away from the loading area about noon by one Albert Uphouse. When Uphouse stopped at a red traffic light a few blocks from the loading area, the door on the passenger side of the tractor was suddenly opened and appellant DeLorenzo jumped in. At gun-point, DeLorenzo ordered Uphouse to drive the tractor-trailer to 39th Street and 3rd Avenue. He did. At that intersection, upon further order of DeLorenzo, Uphouse got out of the tractor and got into the rear of a waiting car. Appellant McCarthy was behind the wheel of the car. DeLorenzo got in and sat next to McCarthy. The three drove around Brooklyn for about four hours. Eventually Uphouse was released somewhere in Brooklyn.

In the meanwhile, still on February 19, White arrived at the intersection of 39th Street and 3rd Avenue where the tractor-trailer had been left by Uphouse at DeLorenzo's order. White drove the tractor-trailer by pre-arrangement to a parking lot in Manhattan where he disengaged the tractor from the trailer. The trailer was left in the parking lot. The tractor was driven by White to New Jersey where it was abandoned.

Four days later, on the evening of February 23, White arrived with a rented truck at the parking lot where the trailer had been left. There he met Pando who, after telephoning McCarthy, told White to return to the parking lot early the following morning. He did.

Early on the morning of February 24, White met Pando at the parking lot. They had a brief conversation with McCarthy and DeLorenzo who were parked in a Cadillac around the corner from the parking lot. Upon instructions from McCarthy, White and Pando returned to the parking lot and transferred about half of the tin ingots from the trailer to the rented truck. Later that morning, McCarthy returned to the parking lot. He told White to drive the rented truck containing the tin ingots to a smelter in Queens and to do so by following McCarthy's car in which he was accompanied by Pando and DeLorenzo. White did so.

In the meanwhile, also on February 24, appellant Komplita contacted the manager of the smelter at about 8 A.M. and was informed that the tin ingots could be smelted provided they arrived by 1 P.M. Komplita returned to the

smelter at 11 A.M. and informed the manager that the truckload of ingots had arrived. When McCarthy's car, followed by the truck containing the ingots, arrived in the vicinity of the smelter, it pulled to the side of the road where Komplita was waiting. McCarthy, DeLorenzo and Pando talked with Komplita. Following this conversation, McCarthy directed White to back the truck up to the smelter where White and Pando, with the help of two employees of the smelter, began unloading the ingots.

At 11:35 A.M. on February 24, agents of the F.B.I., who had had the three appellants as well as White and Pando under surveillance that day, moved in and arrested them. White and Pando were arrested at the smelter. The three appellants were arrested about 20 feet from a diner near the smelter. After the arrests, one of the F.B.I. agents went to the smelter where he observed tin ingots in a large smelting kettle underneath which a fire was burning. Those ingots nearest the bottom of the kettle already were in liquid form. The other ingots later were identified as part of the load that had been hijacked five days before.

There of course was a great deal more evidence adduced at the two week trial. The foregoing summary, however, is adequate for an understanding of the rulings below. None of the appellants challenges the sufficiency of the evidence, except for Komplita's claim (discussed under section V below) that there was insufficient evidence that he had constructive possession of the stolen ingots.

## II.

DeLorenzo's chief claim of error on appeal is that he was prejudiced by the admission of evidence that he actually participated in the hijacking of the truck, although he was charged only with possession of the stolen ingots contained in the truck.

The short answer to this claim is that the challenged evidence clearly was admissible to establish one of the essential elements of the crime of unlawful possession of the stolen ingots, namely, *knowledge* that they had been stolen. It would be difficult to perceive evidence any more probative of knowledge on the part of DeLorenzo that the ingots had been stolen than evidence that he himself had participated in the theft of the truck and its contents. Under the settled law of this Circuit with respect to the admissibility of other-crimes-evidence, we hold that the probative value of the evidence that DeLorenzo participated in the hijacking outweighed its asserted prejudicial character. See, e. g., United States v. Bradwell, 388 F.2d 619, 621–22 (2 Cir.), cert. denied, 393 U.S. 867 (1968), and authorities cited at 622; United States v. Deaton, 381 F.2d 114, 117–18 (2 Cir. 1967), and authorities cited at 117–18.

As for the claimed prejudicial character of the hijacking evidence, it certainly was no more prejudicial than evidence of kidnapping which we held in United States v. Barrett, 280 F.2d 889 (2 Cir. 1960), was properly admissible in a prosecution under this same statute, 18 U.S.C. § 659. Furthermore, while DeLorenzo's claim here does not involve the propriety of being tried or sentenced on separate counts of hijacking a truck and possession of its contents (as in the case of appellant McCarthy), we do note that we recently have upheld convictions under 18 U.S.C. § 659 on separate counts charging theft of a tractor-trailer containing goods moving in interstate commerce and unlawful possession of the same truck and its contents, United States v. Meduri, 457 F.2d 330 (2 Cir. 1972), as well as convictions on separate counts charging theft and possession of goods stolen from an interstate shipment, United States v. Cusumano, 429 F.2d 378, 381 (2 Cir.), cert. denied sub nom. Riggio v. United States, 400 U.S. 830 (1970). See also United States v. Ploof, 464 F.2d 116, 119–20 (2 Cir. 1972); United States v. Vasquez, 468 F.2d 565, 566 (2 Cir. 1972). Clearly, had DeLorenzo been indicted for participat-

ing in hijacking the truck as well as for possession of its contents, he would not have been entitled to a severance on the ground that two distinct crimes had been charged. Nor would he have been in a position to complain if concurrent sentences on such counts had been imposed (as in the case of appellant McCarthy), since there would have been no spillover from the hijacking count which could have prejudiced him on the possession count. United State v. Vasquez, supra, 468 F.2d at 566–67; United States v. Gaines, 460 F.2d 176, 179–80 (2 Cir.), cert. denied, 404 U.S. 878 (1972).

We appreciate the force of De-Lorenzo's claim that he was surprised at his trial on a charge of possession when the government offered evidence that he had participated in the hijacking. From the government's standpoint, it came about this way. The driver of the hijacked truck, Uphouse, had been unable, prior to trial, to identify from photographs the man who suddenly opened the door on the passenger side of the tractor, jumped in and gave him orders at gun-point. At the trial, however, when Uphouse saw DeLorenzo for the first time since the hijacking, he immediately made an in-court identification of DeLorenzo as the hijacker.[2] From the standpoint of DeLorenzo, his skillful trial counsel during summation appears to have accommodated himself to the surprise sufficiently to have made the following argument to the jury, thus effectively confirming the relevance of the hijacking evidence to the possession charge:

"I say to you very frankly, that if you find that my client held up Mr. Uphouse on February 19th, and the Government has established that to your satisfaction beyond a reasonable doubt, you find him guilty of the possession of the merchandise on February 24th.

Of course, if he held him up, then he was involved in the possession, even though it was not physically in his custody. He had to be involved in the possession, he had to have exercised dominion and control over it, as the Court will charge you.

But on the other hand, the converse is also true."

We hold that the evidence that De-Lorenzo participated in the hijacking was properly admitted at his trial on the charge of possession.

### III.

Two of the appellants contend that conduct of the prosecutor during summation was improper.

### (A)

McCarthy claims that his Fifth Amendment privilege against self-incrimination was violated when the prosecutor in summation commented on McCarthy's failure to bare his arms to the jury so they could determine whether tatoo marks were present.

The driver of the hijacked truck, Uphouse, testified that, after the hijacking, he saw a tatoo on the arm of the driver of the passenger car in which he and De-Lorenzo were driven around Brooklyn for some four hours. Uphouse identified McCarthy as the driver of the car. McCarthy did not take the witness stand. At no time during the trial was he asked to display his arms to the jury.

■■ Upon the record before us, we find it neither necessary nor appropriate to rule on the asserted constitutional claim. In the exercise of our supervisory power in the administration of federal criminal justice, we hold that it was improper as a matter of trial conduct for the prosecutor to comment in summation upon the failure of McCarthy to bare his arms to the jury. But we also hold that, assuming this were error,[3] it

---

2. See United States v. Bradwell, *supra*, 388 F.2d at 621 n. 1.

3. If the government had considered the presence of tatoo marks on McCarthy's arms to be critical on the issue of iden-

was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18 (1967). The issue was that of identification of McCarthy as the driver of the get-away car. There was more than sufficient other evidence, not only identifying McCarthy in this role, but implicating him in the crimes of hijacking the truck and possession of the ingots contained therein. Indeed, McCarthy does not challenge the sufficiency of the evidence.

### (B)

■ DeLorenzo claims that he was prejudiced by certain inflammatory remarks made by the prosecutor during summation. The remarks referred to are those based on evidence that DeLorenzo participated in the hijacking, including his holding up the truck driver at gun-point. We have held above that such evidence was properly admitted. It follows that the prosecutor's comments which are said to have been inflammatory were comments on evidence in the record.

Moreover, the prosecutor's comments on such evidence in summation clearly were within the range of fair rejoinder to the summation of DeLorenzo's counsel. United States v. Lipton, 467 F.2d 1161, 1169 (2 Cir. 1972), and cases there cited. Specifically, DeLorenzo's counsel made a massive attack upon the accuracy of Uphouse's identification of DeLorenzo as the armed hijacker—an attack not only upon the eyesight and memory of Uphouse, but also upon his being "in cahoots with the thief". In response to such an argument by DeLorenzo's counsel, we think that the prosecutor's summation was within fair bounds when

he reminded the jury that Uphouse was not likely to forget a man who had held him at gun-point for more than four hours; and that, far from being a thief, Uphouse actually was the hijacking victim whose life had been threatened by the hijacker.

Finally, there was no airing of the prosecutor's personal views or reference to evidence not in the record—conduct which we criticized in United States v. Isaza, 453 F.2d 1259 (2 Cir. 1972), slip op. 1429, 1431–34 (January 19, 1972).

We hold that the attacks by appellants McCarthy and DeLorenzo upon the conduct of the prosecutor in summation are not sufficiently meritorious to warrant a new trial.

### IV.

Komplita contends that he was arrested on the morning of February 24 without probable cause. He claims that he was arrested merely because he was seen talking with McCarthy and DeLorenzo near the smelter and that after being arrested he was taken to the smelter solely for the purpose of obtaining evidence against him in the form of an identification of him by the manager of the smelter. He argues in his brief that "[a]t the time of this 'arrest' neither Mullin [the F.B.I. agent who arrested Komplita] nor any other F.B.I. agent had any information about, made any observations of, or had the slightest cause, probable or suspicious, to believe that appellant had committed, or was committing any crime." Komplita's claim is factually incorrect.

The record shows that a team of F.B.I. agents who were working jointly on the case had had under surveillance throughout the morning of February 24

---

tification, it undoubtedly could have obtained an order, upon timely application, requiring him to submit his arms for inspection. The cases are legion that an accused can be required, without violating his privilege against self-incrimination, to submit his bodily or other identifying features for inspection. See, e. g., United States v. Wade, 388 U.S. 218, 221–23 (1967) (lineup); Schmerber v. California, 384 U.S. 757, 760–65 (1966) (blood-alco-

hol test); Holt v. United States, 218 U.S. 245, 252–53 (1910) (putting on clothing used in crime); United States v. Doe (*Devlin*), 405 F.2d 436, 438–39 (2 Cir. 1968) (handwriting exemplars); 8 Wigmore, Evidence § 2265 (McNaughton rev. 1961). Cf. United States v. Doe (*Schwartz*), 457 F.2d 895, 896–97 (2 Cir.), stay granted, 406 U.S. 955 (1972) (handwriting exemplars).

the three appellants, as well as White, Pando and others involved in the enterprise. Their surveillance had shown, among other things, that about a half hour before his arrest, Komplita had walked from the diner in the direction of the smelter where he had disappeared; that five or ten minutes later, he had walked back to the diner; that near the diner he joined McCarthy (known by the F.B.I. to have been involved in the hijacking); and that at the time of his arrest, he was talking with both McCarthy and DeLorenzo (both of whom had been seen escorting the truck of stolen ingots to the smelter). As a result of the surveillance reports from the team of F.B.I. agents, their superior, Special Agent Ahearn, ordered Mullin "to pick up the three individuals on the corner", referring to appellants McCarthy, DeLorenzo and Komplita. He did.

■ We hold, on the totality of the facts and circumstances summarized above, that at the time of Komplita's arrest, F.B.I. agent Mullin, acting upon an order of his superior that resulted from the pooling of the knowledge of the surveillance team of F.B.I. agents, was warranted as a prudent man in believing that Komplita had committed or was committing a crime. In short, on February 24, sometime after 11 A.M., F.B.I. agent Mullin had a reasonable basis for a precise prediction that a crime not merely was about to occur, but was in progress; and that Komplita was engaged in the commission of that crime. Raffone v. Adams, 468 F.2d 860, 866 (2 Cir. 1972), and authorities cited at 866–67.

We hold that there was probable cause for Komplita's arrest.

### V.

Komplita also contends that the district court erred in refusing to charge that, in the case of an aider and abettor, no inference of knowledge that property has been stolen can be drawn from unexplained possession of recently stolen property by those being aided and abetted; and in refusing to amplify its charge on the meaning of dominion and control in relation to constructive possession.

In the light of these contentions, we have examined the court's charge in its entirety, and particularly those portions dealing with possession. We find that the charge sets forth clearly the requisite definitions of possession in substantially the language approved in this Circuit. The court explained actual and constructive possession; sole and joint possession; and, with respect to constructive possession, that "[a] person who, although not in actual possession, knowingly has both the power and the intention, at a given time, to exercise dominion or control over a thing, either directly or through another person or persons, is then in constructive possession of it."

Then on the permissible inference of knowledge to be drawn from unexplained possession of recently stolen goods, the court charged as follows:

"More than possession, however, is required to make out the offense charged in Count Two. It is necessary as one essential element of the charge that the defendant know at the time of possession that the tin pigs were stolen. Of course, if you find from the evidence that a defendant was one of those persons who actually stole the pigs, he has direct knowledge. As to a defendant as to whom you fail to find such direct knowledge that the property was stolen, you will apply the rule that possession of property recently stolen, if not satisfactorily explained, is ordinarily a circumstance from which the Jury may reasonably but need not draw the inference and find, in light of the surrounding circumstances, shown by the evidence in the case, that the person in possession knew the property had been stolen.

If, however, after considering all the evidence in the case including the explanation, if one has been offered, you have a reasonable doubt of guilt, you must acquit."

■ We find the court's charge on the issue of possession to be unexceptionable. Indeed, we do not understand Komplita to challenge its correctness. His contention, rather, is that it was inapplicable to him as only an aider and abettor—a mere "facilitator". He claims that, as an aider and abettor, knowledge that the goods had been stolen could not be attributed to him from the possession of the goods by others.

■ Upon the entire record, it is abundantly clear that Komplita was more than an aider and abettor. There was substantial evidence that he was jointly engaged with McCarthy and DeLorenzo in the hijacking of the truck and its contents and in the disposition of the stolen ingots. He was present on the morning of February 19 at the initial meeting between McCarthy, DeLorenzo, White and Pando, shortly after which the hijacking took place. Four days later, he made the arrangements for the stolen ingots to be smelted, including a false explanation for the truck's delay in arriving at the smelter. It was Komplita, together with McCarthy and DeLorenzo, who saw to it that the ingots were in the process of being reduced to liquid form—just a step ahead of the arrival of the agents of the F.B.I. Far from being a "casual facilitator", Komplita surely had a "working relationship" with those engaged in this criminal enterprise. United States v. Jones, 308 F.2d 26, 30 (2 Cir. 1962) (en banc). It would be unrealistic indeed to view this whole operation as other than a continuous one. Komplita as a participant in the common scheme was as much in constructive possession of the stolen ingots as McCarthy and DeLorenzo.

We hold that the district court correctly refused to modify its charge on constructive possession as requested by Komplita—a requested charge that presupposed that he could be convicted without finding that he was jointly engaged with McCarthy and DeLorenzo in this criminal enterprise. See United States v. Casalinuovo, 350 F.2d 207, 209–11 (2 Cir. 1965).

■ We reject as frivolous Komplita's contentions that the district court erred in refusing to amplify its charge on the meaning of dominion and control, and that there was insufficient evidence that he had constructive possession of the stolen ingots.

## VI.

All appellants contend that the trial judge unduly interfered with the trial of the case and thereby deprived them of a fair trial.

■ While the attack upon the conduct of the trial judge is an omnibus one, it boils down to three principal categories: the large number of questions the court asked the witnesses; interference with defense counsel's cross-examination; and reading back of virtually the entire testimony of the witness Uphouse during the jury's deliberations, after the forelady had indicated they had heard enough.

In view of the nature of appellants' alleged claims of error in this regard and the earnestness with which they press them, we have scrupulously examined the entire trial transcript of approximately 1800 pages covering this eleven-day trial. Daley v. United States, 231 F.2d 123, 128 (1 Cir.), cert. denied, 351 U.S. 964 (1956). Based on our examination of the record from cover to cover, we have reached the following conclusions:

(1) That the conduct of the trial judge complained of was far from unprovoked. Indeed, we are left with the unmistakable impression that counsel for appellant DeLorenzo engaged in a course of conduct throughout the trial designed to confuse the jury and to goad the judge into error.

(2) That, while it would have been better for the judge not to have participated in the questioning of the witnesses to the extent that he did, our careful scrutiny of the record satisfies us that in every instance his questioning was directed toward clarifying the issues and assisting the jury in understanding the evidence. In short, the judge did precisely what we sanctioned in United States v. DeSisto, 289 F.2d 833, 834 (2 Cir. 1961):

> "A trial judge in criminal, as in civil cases, may, indeed must, be more than a mere moderator or umpire in a contest between two parties in an arena before him. He should take part where necessary to clarify testimony and assist the jury in understanding the evidence and its task of weighing it in the resolution of issues of fact."

(3) That, of decisive importance, we do not find a single instance of conduct on the part of the judge that in any way prejudiced any of appellants or displayed the slightest bias toward them. This applies to the judge's questioning of witnesses, determining the proper scope of cross-examination and exercising his discretion as to how much of a witness' testimony should be read back to the jury in the interest of fairness and completeness. See United States v. D'Anna, 450 F.2d 1201, 1206 (2 Cir. 1971); United States v. DeSisto, supra, 289 F.2d at 834; Daley v. United States, supra, 231 F.2d at 130.

In short, we hold that the conduct of the trial judge did not deprive them of a fair trial, for we can say with fair assurance, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." Kotteakos v. United States, 328 U.S. 750, 765 (1946).

Cf. United States v. Ellis, 461 F.2d 962, 970 (2 Cir. 1972).

Finally, we have considered appellants' other claims of error and we find them without merit. Appellants were convicted after a fair trial on the basis of overwhelming, uncontradicted evidence of serious crimes committed nearly two years ago. We order that the mandate issue forthwith.

Affirmed.